Docket No. 81314–Agenda 27–May 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 RONALD KLINER, Appellant.

Opinion filed December 3, 1998.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Ronald Kliner, was charged in Cook County with two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(a)(1), (a)(2)) and one count of conspiracy to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8–2). These charges related to the February 18, 1988, murder of Dana Rinaldi in Palatine, Illinois. The jury returned verdicts of guilty against defendant on all counts and the trial court entered judgment on the murder verdict. Defendant waived a jury for the death sentencing hearing. The trial court found defendant eligible for the death penalty on the basis that he committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(5)). After considering evidence in aggravation and mitigation, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death for the murder of Dana Rinaldi. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant's conviction and death sentence.

FACTS

The evidence adduced at trial showed that at around 12:30 a.m. on February 18, 1988, two neighbors, John and Deborah Fostin, discovered the body of Dana Rinaldi in her car located in the parking lot of the Wyndham Court apartment complex in Palatine, Illinois. Dana had lived in that apartment complex with her husband, Joseph Rinaldi. Dana was found seated on the driver's side of her blue Mustang, slumped over to the passenger side. Her left leg was hanging out of the driver's side door. An assistant medical examiner, who performed an autopsy on Dana, testified that Dana, while seated in her car, had been shot five times in the face and head from a distance of 18 to 24 inches. Three gunshot wounds to her hands also suggested that Dana had raised her hands in front of her face in an attempt to protect herself. The cause of death was determined to be multiple gunshot wounds.

 After arriving on the scene shortly after discovery of Dana's body, police officers found six .22-caliber spent shell casings and one .22-caliber live round on the ground close to Dana's car. The live round had an indentation indicating the firing pin had struck the bullet but did not discharge it. A firearms tool mark examiner later concluded that the six shell casings and the live round were all .22 Long Rifle caliber and had been fired from the same weapon. In addition to the casings and the bullet, police officers found Dana's gloves, which she was wearing, and her purse in the car, both of which displayed bullet holes. No fingerprints were found in the car.

Police officers interviewed a number of Dana's neighbors, including Paul Skorupa, shortly after the discovery of the body. When Skorupa returned home around 11:45 p.m. on February 17, 1988, he nearly rear-ended a 1987 or 1988 red Nissan Pulsar in the apartment complex's parking lot. Under lighting conditions which he described as “pretty good,” Skorupa could see the passenger in the car. Skorupa viewed a group of photographs three days later, picked out defendant's photograph, and said that defendant “looked like” the passenger in the Nissan Pulsar. Skorupa, however, was unable to identify anyone at a lineup conducted five years later. When Skorupa last saw the red car, it was parked toward a cul-de-sac at the end of the driveway. Skorupa did not see the victim's car at this time. On cross-examination, Skorupa acknowledged that he had seen another red Nissan Pulsar parked in the apartment complex parking lot a few days after the murder. On redirect, however, he testified that it did not resemble the car he had seen on the night of the murder.

Neighbor Tyrone Miller testified that he heard his dog barking sometime between midnight and 12:30 a.m. on the night of the murder. When he looked out his upstairs bedroom window, Miller saw a man jogging or walking fast down the street. The man stopped below Miller's window, looked at Miller, and ran away. Miller got a good look at his face and identified codefendant Michael Permanian in open court. Miller also identified Permanian as the man he had seen the night of the murder, during a photograph array conducted a few days after the murder, as well as at a lineup held five years after the murder. The last thing that Miller observed on the night of the murder were headlights leaving the area. On re-cross-examination, Miller acknowledged that if asked by the police to make an identification, he would falsely identify someone about 10% of the time based upon his mood.

During the early morning hours of February 18, 1988, police officers also interviewed the victim's husband, Joseph Rinaldi, who cried upon learning of Dana's death. When officers asked Rinaldi if he knew anyone who owned a small red sports car, Rinaldi offered the name of his friend Michael Permanian. Permanian was later photographed getting out of a red Nissan Pulsar at Dana's wake. It was later confirmed that Permanian was the owner of a red 1988 Nissan Pulsar.

No arrests were made in this case until June 10, 1993 following grand jury testimony by Tammy Behenna, defendant's former girlfriend, and John Apel, Sr., defendant's uncle. These witnesses along with Joseph Rinaldi testified for the State. Rinaldi testified in exchange for, among other things, the prosecutor's promise to recommend a 40-year sentence, although he later received a sentence of 60 years' imprisonment after pleading guilty to murder, conspiracy, and solicitation. Rinaldi testified that he had married Dana in 1980, and they began having marital problems in the fall of 1987 when the couple was deeply in debt. About this time, Rinaldi began meeting with Michael Permanian, a close friend since childhood who had served as best man at his wedding. Rinaldi indicated to Permanian that he was having marital problems and wanted to have his wife killed because divorce was not an option given their debts. Permanian suggested that Rinaldi meet with defendant because defendant might be able to help Rinaldi with his problem. Rinaldi also had been acquainted with defendant since his childhood.

Prior to the murder, Rinaldi met with both Permanian and defendant, both of whom agreed to kill Dana. Defendant even pointed to a gun tucked in his waistband when Rinaldi asked how he would do it. Rinaldi informed them that he wanted it to look like a botched robbery attempt and defendant and Permanian agreed. Rinaldi provided defendant and Permanian with background information regarding Dana's employment and their apartment complex, the Wyndham Court Apartments. Rinaldi drew a map of the complex indicating the exact location where Dana usually parked her car. Rinaldi also informed defendant and Permanian about a $50,000 life insurance policy he had obtained on Dana's life and agreed to give them half of those proceeds. After investigating the matter, defendant and Permanian reported to Rinaldi that the apartment complex was the best place to kill Dana. Defendant and Permanian announced that they planned to commit the murder on February 17, 1988, and Permanian indicated that they would steal a car. Permanian suggested that Rinaldi go out on the night of the murder and page him as soon as he was finished talking to the police.

Rinaldi further testified that he called his friend Jim Groszka and persuaded him to go drinking with him in downtown Chicago on the night of February 17, 1988. Groszka later corroborated this in his own trial testimony, adding that he was surprised by Rinaldi's call and agreed to go out because Rinaldi was insistent. Groszka testified that he and Rinaldi were together at several bars in Chicago from 9 p.m. on February 17, 1988, until about 4 a.m. on February 18, 1988.

On February 17, 1988, Rinaldi visited his wife at work, which was 10 miles from their home, and took her out to dinner. Jennifer Sparesus, one of Dana's coworkers, corroborated Rinaldi's testimony regarding his visit at the office, and his announcement that he was going downtown later that night. Dana returned to the office after dinner. Sparesus testified that she last saw Dana around midnight when Dana indicated that she was going home.

Rinaldi testified that he returned home sometime after 4 a.m. Upon arriving home, Rinaldi knew the murder had been carried out because he saw Dana's car being towed away.

Following the murder, Rinaldi testified that he received more insurance proceeds than he originally anticipated. Rinaldi received approximately $137,000. Rinaldi had originally agreed to pay defendant and Permanian $25,000, and he did not immediately inform them of the additional funds. Rinaldi began making weekly payments to defendant and Permanian shortly after the murder. Permanian later contacted Rinaldi and informed him that he and defendant had learned about the additional insurance proceeds. Rinaldi agreed to pay defendant and Permanian $55,000. Rinaldi had meetings with defendant and Permanian regarding the insurance proceeds. Rinaldi testified that he was threatened by defendant and Permanian with respect to making payments to them and speaking to the police.

Rinaldi testified that, on September 28, 1993, while he, defendant and Permanian were in a holding cell awaiting transportation for a court appearance, Permanian talked about how he and defendant had driven to Indiana at speeds exceeding 100 miles per hour after the murder, where they disposed of the clothes and gun used to commit the murder. Both defendant and Permanian were laughing as they recalled how officers had dragged Lake Michigan looking for the gun.

Rinaldi further recounted how, in late October, while all three men were in a lockup, Rinaldi saw defendant and Permanian re-

enact the murder. Permanian sat on a bench while defendant stood over him, defendant's hand pointed at Permanian's head, and defendant's index finger stuck out as if he were holding a gun. After Permanian put his hand up by his face, defendant indicated that was how he shot Dana. Defendant also indicated that the gun had jammed during the shooting.

Rinaldi testified that, in January 1995, he had a conversation with defendant and Permanian before he testified at a suppression hearing on a defendant's motion to suppress his statements to police. Both defendant and Permanian coached him in an effort to get his statements suppressed. They advised him to testify that officers had threatened him, offered leniency to him, and denied his requests for counsel. When Rinaldi testified at the suppression hearing, he claimed coercion. At trial, however, Rinaldi admitted that he had perjured himself in that testimony.

Tammy Behenna, defendant's former girlfriend, testified for the State at trial. Behenna met defendant in 1987. Defendant and Behenna occasionally spent the night at her apartment prior to moving in together in October, 1988. They lived together until July 1, 1991. Defendant and Behenna had a child together, a son. Behenna recounted the events of February 17, 1988, in her testimony. According to Behenna, defendant got up around 11 p.m. and put on a suit. Defendant then left the apartment and did not return that night. Defendant called Behenna the next morning, February 18, 1988, and informed her he was okay and was going out to eat. Defendant returned to the apartment later that morning and went back to bed. When he heard a radio news report, however, he jumped out of bed and screamed, “That can't be right. They can't have a suspect.” Behenna overheard defendant then make a phone call, during which he mentioned the name “Mike.” Later that day, defendant called Behenna at her office and informed her that he had to meet “Mike” and that “they were going to make a deposit in Lake Michigan.” On the evening of February 18 or 19, 1988, defendant asked Behenna to listen to a tape recording of a conversation between Permanian and Rinaldi. Defendant asked her if Rinaldi sounded like a man who had spent two months practicing his crying. Behenna recalled that defendant made a lot of phone calls on February 18 and 19, and that he clipped a lot of newspaper articles about the Rinaldi murder.

Behenna testified that, when she was subpoenaed to appear before the grand jury in April of 1988, she claimed the fifth amendment privilege, as defendant had advised her, and refused to testify. Behenna testified that when she was served with the subpoena to appear before the grand jury, defendant informed her that people can die in a number of ways, including being struck by a car while crossing the street. Defendant then had Behenna cross the street to mail a letter.

Behenna stated that defendant had a conversation with her about the Rinaldi murder in August of 1988, when they visited Great America amusement park. Defendant stated to Behenna that “I want you to picture this. It's cold outside. It's late. It's dark ... somebody is just coming home from work.... And I walk up to her car and point a gun at her. And she says `what are you doing?' And then she put her hand up, and then I shot her five times.” Behenna stated that defendant was smiling when he relayed this information to her. Behenna also recounted that, in July of 1990, defendant walked up to her, put his finger to her head, and impersonated a woman's voice as he said: “What are you doing?” Defendant then said “bang” five times.

Behenna further testified that, sometime in February of 1988, or the fall of 1989, defendant mentioned Joe Rinaldi and that he was angry with Rinaldi and that he wanted Rinaldi to pay him for a job he had done. In the fall of 1989, Behenna saw defendant kneeling on the floor of their bedroom, counting what appeared to be a large amount of cash. Defendant looked at the money and asked, “Is this worth a life?”

On cross-examination, Behenna admitted that she had engaged in a sexual relationship with Permanian in 1991, just before she and defendant stopped living together. Behenna stated that she stopped living with defendant after July 1, 1991, and moved in with her parents. Behenna began cooperating with the police in September of 1991, and testified before the grand jury in May of 1993. Behenna acknowledged that she was involved in ongoing litigation with defendant and his parents regarding visitation with her son.

John Apel, Sr., defendant's uncle and a Chicago police officer, also testified for the State. Apel testified about a number of incriminating statements defendant made to him. On February 18, 1988, around 6 p.m., defendant called him at home and told him to watch the news that night. Apel did so and heard an account of the Rinaldi murder. Defendant called him again that night to confirm Apel had watched the news, and defendant specifically referred to the murdered girl in Palatine, at which time defendant began laughing.

Sometime in May of 1988, defendant unexpectedly arrived at Apel's home. Defendant honked the horn repeatedly and drove partially onto Apel's driveway and his neighbor's lawn. Defendant admitted to Apel that he had killed Dana Rinaldi and provided details, including how he had stuck a gun to her head and pulled the trigger, and how she had thrown up her arms with a terrified look on her face. Defendant relayed that he laughed when he shot her in the head. Defendant also told Apel that the gun had jammed at one point. After relaying this information, defendant threatened that he would kill the members of the Apel family if his uncle said anything.

On cross-examination, Apel admitted that he did not inform anyone at the police department or make a written report about these admissions by defendant. Apel also admitted that he had claimed the fifth amendment privilege when he appeared before the grand jury in May of 1988. Apel explained that he did so because he was afraid of defendant. Apel stated that he did discuss defendant's statements when subpoenaed to appear before the grand jury a second time, in May of 1993, after defendant was in jail. Apel also admitted that he continued to engage in a business relationship with defendant even after the driveway conversation described above because defendant is a “pushy kind of person” and because “[i]t is either you are his enemy or you are his friend.”

Apel's son, John Floyd Apel, also testified at defendant's trial. John corroborated his father's testimony about the conversation in the driveway of the Apel home in May of 1988. He also testified that he was present for another conversation with defendant in which defendant stated that “he could kill anyone just like he had killed the Rinaldi girl.” John believed that this conversation had taken place in the fall of 1992, although he stated he could not recall the date with certainty, only that it was before defendant was incarcerated. The parties later stipulated that defendant had been continuously incarcerated in the Cook County jail from April 8, 1992, on another charge to the time of this trial.

Defendant called two witnesses, Todd Pugh, a law student working for the defense, and John Eierman, an investigator for the defense, to rebut the testimony of the State's witness Tyrone Miller. Pugh, Eierman and counsel for Permanian visited the Rinaldi's apartment complex, Wyndham Court, on February 18, 1996, to test the accuracy of Miller's observations. Each took a turn looking out the lower-level window of Miller's former apartment, and out the second-story window of a neighboring apartment, while another walked or jogged past the apartment. Both Pugh and Eierman testified they could not make an identification from that vantage point. On cross-examination, Pugh and Eierman acknowledged they did not know the lighting conditions on the actual day of the murder, nor did they know to what extent trees and bushes might have grown since then to obscure their vision. Moreover, both witnesses admitted they did not look out the bedroom window at which Miller was standing when he saw Permanian. Eierman also testified that the others could not see the headlights in the manner suggested by Miller when Eierman drove his car behind the clubhouse. Eierman, however, admitted that they did not attempt the experiment with a 1988 Nissan Pulsar.

Defendant called a final defense witness, Cook County sheriff's police officer Ronald Russell, to impeach the testimony of State's witness Paul Skorupa. Russell acknowledged that he had prepared a police report in which he reported that Skorupa saw the victim's blue Mustang parked on the street when he returned home around 11:45 p.m. On cross-examination, however, Russell testified he had erred when he drafted the report because Skorupa indicated that, although he saw the victim's car parked on the street in the past, he did not see the victim's car on the night of the murder.

In the State's rebuttal case, Palatine police officer John Saurmann testified he was sent to the Wyndham Court apartments on February 18, 1996, after someone reported suspicious people on the premises. Saurmann saw Pugh, Eierman and Permanian's attorney at the apartment complex. Although he stayed for some time, Saurmann did not see any of the men walk up and down the street and then look up at the apartment window. Saurmann stated that no one asked him if he could identify anyone from where he stood by the apartment.

In surrebuttal, defendant presented codefendant Permanian's attorney to contradict the evidence given by Saurmann. He testified that, when he asked Saurmann, who was standing by the apartment, if he could identify Pugh or Eierman, who were by the street, Saurmann replied that he could not.

After considering the aforementioned evidence, the jury returned verdicts finding defendant guilty of murder and conspiracy to commit murder. The sentencing hearing was conducted before the trial judge because defendant had previously waived a jury for sentencing. After the State provided evidence that defendant was over 18 years of age, and the trial judge took judicial notice of the verdicts and the trial testimony, the trial judge found defendant eligible for the death penalty because the murder had been committed pursuant to a contract. Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(5).

The State then presented extensive evidence in aggravation. Assistant Cook County State's Attorney Patrick Quinn testified that inmate Charles Russell called him on June 3, 1993, and that he and Detective John Duffy later visited Russell in the Kendall County jail. Russell stated that, sometime before April of 1993, when he was in Cook County jail, defendant asked him to find someone to kill a woman named Tammy. Defendant said the woman planned to testify against him in his aggravated battery and murder cases. Russell agreed to do so for $25,000, with half to be paid up front. When he talked to Quinn, Russell stated that he had already received $11,000 through intermediaries. When Quinn sought to verify Russell's story, he learned that Russell had been on the same jail tier as defendant. Quinn met with Russell again on June 11 in the company of Officers Dornbos and Duffy. Russell repeated the same story and said he had already received $11,000 from defendant. Russell gave Quinn a note with Behenna's name on it, which Quinn submitted for analysis. After comparing the note with the known handwriting of defendant, forensic document examiner Maureen Casey-Owens concluded that defendant had written the note. Russell later offered to wear a transmitting device and requested that Quinn help him with his existing prison sentence. Quinn refused and his contacts with Russell then ended.

The State also presented evidence of defendant's solicitation to murder John Apel, Sr. Quinn testified that he was contacted in January of 1994 by Detective Mike Fleming, who reported that he had a note that had been seized during a routine search of inmate Maurice Coleman's cell at Cook County jail. The note refers to John Apel, Sr., describes where he lived and worked, contains maps, and contains other personal information about Apel. When Quinn talked to Coleman in January of 1994, Coleman told him that defendant had given him the note and asked him “to see to it” that the police officer named therein (John Apel, Sr.) was murdered. Coleman added that defendant had deposited $900 in his commissary account, and Quinn verified that Coleman had indeed received $900 in his account at the time he said he had talked to defendant. Coleman wanted Quinn to help him with a pending murder charge, which Quinn could not do. Document examiner Casey-Owens concluded that defendant had written this note as well as the Behenna note. Officer Duffy corroborated Quinn's testimony about the Apel contract.

The State also presented evidence of defendant's criminal record. The State presented a police “rap sheet” showing defendant's numerous prior arrests. The State also showed that, before his sentencing hearing in this case, defendant had been convicted of aggravated battery, aggravated unlawful restraint and two counts of unlawful use of weapons. The State also produced newspaper clippings which described crimes that defendant had been charged with committing. Apel, defendant's uncle, testified that, shortly after each crime, defendant gave him a newspaper clipping about defendant's involvement in a crime. The State then presented testimony about defendant's alleged involvement in the burglaries of several department stores, “road rage” incidents in which defendant displayed a gun, defendant's fire bombings of fellow students' homes and threats to them while in college, defendant's threats to Tammy Behenna and her family, and defendant's threats to an attorney who had previously represented defendant.

The State also presented evidence of defendant's gun purchases and possession of weapons. Cook County sheriff's police detective Thomas Mayton was assigned to investigate the Rinaldi murder, and he checked the records of various gun shops. Detective Mayton found that defendant, prior to the murder, had purchased various types of handguns and rifles. Defendant was also found in possession of two different guns when he was arrested on two occasions in 1990. Moreover, on three different occasions in 1991 and 1992, when defendant was arrested on unrelated charges, police officers discovered a considerable amount of ammunition of different types and caliber and various weapons in defendant's possession. In addition, when Cook County corrections officer Thomas McInerney conducted a random search of defendant's cell on July 6, 1993, he found two razors under defendant's bunk and a pair of scissors inside the mattress. Defendant admitted possession of the razors in a disciplinary hearing.

Following the State's case in aggravation, the defense presented the following evidence in mitigation. Pat Marz testified that defendant had dated her daughter, and that he was a “gentleman” and “very respectable.”

Anthony Goldstein, defendant's stepbrother, testified that he has known defendant all his life. Defendant is a “good man” who took in homeless people and who allowed them to live in buildings that he owned. Defendant, however, did not live with Goldstein when he lived in Indiana between the ages of 9 and 18.

Alvin Goldstein, defendant's stepfather for 27 years, provided a more comprehensive account of defendant's life. Goldstein described defendant as an intelligent child who learned things quickly. For example, defendant managed to pass exams after cramming at the last minute. After graduating from college, defendant became a paralegal and opened a real estate business. Goldstein testified that, “as an adult, he was just superb.” Defendant showed respect for older relatives, protected his siblings, supported Tammy Behenna, and took in homeless persons. On cross-examination, Goldstein acknowledged that defendant had not lived with him for the last 14 years.

Several professional acquaintances testified on behalf of defendant. Patti Werner knew defendant in the real estate business and briefly dated him. According to her, defendant acted like a gentleman and treated her “great.” John Manglardi also knew defendant from the real estate business. He knew defendant to be helpful and trustworthy. Deborah Fiorito, an attorney, represented defendant in an unrelated matter. Fiorito recalled that defendant's father had abandoned his family. She, however, was not aware of defendant's criminal background.

Nicholas Wayne grew up in defendant's neighborhood and stated that he has known defendant for 20 years. According to Wayne, defendant treated him well and was never violent.

Cleatus Coleman, a business associate of defendant's parents, described defendant as smart, energetic and “above board.” He saw defendant once or twice a month, but defendant stopped visiting him at his store seven to nine years before the trial.

Andy Gonzalez, a volunteer chaplain at Cook County jail, testified that defendant was “wild and crazy” when he first came to him for counseling in the county jail. In his opinion, however, defendant is now calm and well behaved and a positive influence on other inmates.

After considering the evidence in aggravation and mitigation, the trial judge concluded that there were no mitigating factors sufficient to preclude the death penalty and sentenced defendant to death for the murder of Dana Rinaldi.

Codefendants Joseph Rinaldi and Michael Permanian were jointly indicted on charges of murder and conspiracy, with Rinaldi additionally indicted on a charge of solicitation (Ill. Rev. Stat. 1987, ch. 38, par. 8–1(a)). Rinaldi ultimately pled guilty in a separate proceeding and was sentenced to 60 years' imprisonment. With respect to Permanian, the trial court severed his case from defendant's case but conducted their trials jointly before separate juries. A jury found Permanian guilty of two counts of first degree murder and one count of conspiracy. Permanian received a sentence of 75 years' imprisonment.

Additional relevant facts are set forth in the analysis portion of the opinion where necessary for a thorough discussion of the issues.

ANALYSIS

I. Pretrial Issue

A. 
Speedy Trial

Defendant argues that the trial court abused its discretion in denying his motions to dismiss the indictment because the delay between his arrest on June 10, 1993, and the commencement of his trial on January 25, 1996, violated his statutory right to a speedy trial. Defendant therefore requests that we reverse his conviction.

Initially, we note that an accused has a constitutional right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8. An accused also has a statutory right to a speedy trial under section 103–5 of the Code of Criminal Procedure of 1963 (speedy trial statute), which specifies the periods of time within which an accused must be brought to trial. 725 ILCS 5/103–5 (West 1994). The constitutional and statutory provisions address similar concerns; however, the rights established by each of them are not necessarily coextensive. See 
People v. Ramey
, 151 Ill. 2d 498, 525-26 (1992); 
People v. Garrett
, 136 Ill. 2d 318, 323 (1990). In the present case, defendant asserts only a violation of his statutory right to a speedy trial and does not raise a constitutional issue.

Section 103–5(a) provides that an accused in custody must be brought to trial within 120 days from the date he was taken into custody, unless delay is occasioned by the defendant. 725 ILCS 5/103–5(a) (West 1994). Defendant was in custody from his arrest until trial and section 103–5(a) therefore applies. A delay is occasioned by the defendant and charged to the defendant when the defendant's acts caused or contributed to a delay resulting in the postponement of trial. See 
People v. McDonald
, 168 Ill. 2d 420, 438 (1995); 
People v. Turner
, 128 Ill. 2d 540, 550 (1989); 
People v. Reimolds
, 92 Ill. 2d 101, 106 (1982). A defense counsel's express agreement to a continuance may be considered an affirmative act contributing to a delay which is attributable to the defendant. See 
Reimolds
, 92 Ill. 2d at 106. The defendant bears the burden of affirmatively establishing a speedy-trial violation, and in making his proof, the defendant must show that the delay was not attributable to his own conduct. See 
People v. Jones
, 104 Ill. 2d 268, 280 (1984). Any period of delay occasioned by the defendant temporarily suspends the running of the speedy-trial period until the expiration of the delay, at which point the statute shall recommence to run. 725 ILCS 5/103–5(f) (West 1994); see 
McDonald
, 168 Ill. 2d at 438-39; 
People v. Bowman
, 138 Ill. 2d 131, 149 (1990). An accused not tried within the mandate of section 103–5(a) must be discharged from custody, and the charges must be dismissed. See 
Bowman
, 138 Ill. 2d at 137. The trial court's determination as to who is responsible for a delay of the trial is entitled to much deference, and should be sustained absent a clear showing that the trial court abused its discretion. See 
McDonald
, 168 Ill. 2d at 438; 
People v. Bowman
, 138 Ill. 2d 131, 137 (1990); 
Reimolds
, 92 Ill. 2d at 107. With these principles in mind, we now examine the periods of alleged delay in the instant case.

The first period at issue is the 47 days between June 10, 1993, and July 27, 1993. As noted, defendant was arrested on June 10, 1993, for the murder of Dana Rinaldi, and the 120-day period commenced on that date. According to the common law record, which contains the trial court's memorandum of orders, commonly referred to as “half-sheets,” and the transcript of proceedings, the parties first appeared in court on June 11, 1993, when the trial court conducted a probable cause hearing and denied bail. At the conclusion of this hearing, the trial court continued the case until June 22, 1993. The State on appeal concedes that these 12 days are not delays attributable to defendant. The record reveals that the parties next appeared before the court on June 22, 1993, at which time the trial court entered a continuance by agreement of the parties to July 27, 1993. Although there is no transcript available for the proceedings dated June 22, 1993, the record is not silent concerning the reason for the delay because the record includes the half-sheets contained in the common law record. See 
People v. Sojak
, 273 Ill. App. 3d 579, 582-83 (1995). According to both the half-sheet and an order entered by the trial court on June 22, 1993, defendant filed a motion to set bail, which was entered and continued by agreement of the parties to July 27, 1993. In general, an agreed continuance constitutes an affirmative act of delay attributable to the defendant which tolls the speedy-trial term. See 
Turner
, 128 Ill. 2d at 553; 
People v. Plair
, 292 Ill. App. 3d 396, 398 (1997). Given that the continuance was by agreement, this period of time is attributable to defendant.

Defendant argues, however, that the State, during a hearing on a motion to dismiss the indictment on speedy-trial grounds on June 5, 1995, conceded, and the trial court accepted, that the 34-

day delay between June 10, 1993, and July 14, 1993, was not attributable to defendant. At that same hearing, prior to the State's concession, the trial court indicated that the record showed a continuance by agreement between June 11, 1993, and July 27, 1993. The trial court nevertheless accepted the State's concession. We find that the trial court abused its discretion in attributing this delay to the State. See 
Bowman
, 138 Ill. 2d at 139 (in a criminal case, a factual determination by a trier of fact is entitled to great weight, but where the record does not support the finding, this court must reverse). As noted above, the record clearly establishes a continuance by agreement of the parties during this period. Consequently, only 12 of the 47 days between June 10, 1993, and July 27, 1993, should not be attributed to defendant and thereby computed within the 120-day period.

The next period at issue is the 130-day delay between March 14, 1994, and July 22, 1994. Prior to March 14, 1994, defendant filed a series of motions, including a motion for discovery, a motion for substitution of judges, a motion to dismiss indictment, a motion for severance, a motion to suppress statements, and a motion to suppress “message unit detail records” and telephone records. Defendant on appeal concedes, and the record reflects, that he agreed to a series of continuances from July 27, 1993, until March 14, 1994. Defendant contends, however, that the period between March 14, 1994, and July 22, 1994, is not attributable to him because he had to wait for the court to assign another judge to hear his pending motions. We reject defendant's claim because this delay resulted from his filing of the aforementioned motions. A delay occasioned by the processing of the defendant's motions, including the time required for the State to respond and the time necessary for the court to hear and decide the issues, is attributable to the defendant. See 
McDonald
, 168 Ill. 2d at 440; 
Jones
, 104 Ill. 2d at 280.

A detailed review of the events occurring between March 14, 1994, and July 22, 1994, reveals that this delay is attributable to defendant. On March 14, 1994, Judge Kavitt, who recused himself from defendant's case on February 10, 1994, granted Permanian's lawyer leave to file a severance motion. Defendant's attorney did not attend this March 14 proceeding. Judge Kavitt continued the case until April 15. This period of delay is chargeable to defendant. When a defendant's attorney fails to appear in court at the appointed time, his absence causes a delay attributable to the defendant. See 
Bowman
, 138 Ill. 2d at 141; 
People v. Hairston
, 46 Ill. 2d 348, 354 (1970); see 
Sojak
, 273 Ill. App. 3d at 584.

On April 15, 1994, when the parties appeared, Judge Kavitt reminded the parties that he could not proceed on defendant's motions, and that defendant's case would be assigned to a different judge after he had decided Permanian's severance motion, at which time he would know how many judges would be needed to hear the cases. Defendant's attorney agreed that defendant had no reason to pursue his own severance motion at this time because defendant would receive a separate trial as long as the judge granted his codefendant's motion for severance. Judge Kavitt continued the case for a hearing on the severance motion by agreement to May 6, 1994. We note that a defendant has the primary duty to call his motions for hearing and disposition. See 
People v. Donalson
, 64 Ill. 2d 536, 542 (1976). Moreover, when defense counsel replied “that would be just fine” to the continuance, he expressly agreed to the continuance. See 
People v. Arsberry
, 242 Ill. App. 3d 1034, 1039 (1993). A defendant is bound by the acts or omissions of his counsel. See 
Bowman
, 138 Ill. 2d at 141. Consequently, defense counsel's failure to call defendant's motion for severance for hearing and disposition, and counsel's agreement to the continuances during this period, resulted in a delay attributable to defendant.

The parties next appeared on May 6, 1994, when Judge Kavitt considered Permanian's motion for severance. The State agreed to the severance and the trial judge granted the severance of all three cases. Judge Kavitt thereafter transferred the cases to Judge Hoffenberg. On that same day, Judge Hoffenberg noted that defendant had previously removed him via a substitution-of-

judges motion, precluding him from hearing matters relating to defendant. Judge Hoffenberg continued the case by agreement of codefendants' attorneys to June 17, 1994, for a hearing on the motions. Once again, defense counsel did not attempt to call his motions for hearing at this time. Rather, defense counsel stated that he wanted to be there on June 17, 1994, to hear the codefendant's motions. In response, Judge Hoffenberg continued defendant's case by agreement to June 17, 1994, for status. On June 17, 1994, defense counsel moved the court to assign a judge to hear his motions. Defendant's motion was allowed and all three cases were transferred to Judge Bierman. Defendant's and codefendants' attorneys agreed to a continuance to July 22, 1994, for status so that Judge Bierman could hear all pending matters. The period between May 6, 1994, and July 22, 1994, is a delay occasioned by defendant because it arises from defense counsel's failure to call his motions for hearing and from defendant's prior motion for substitution of judge, which results in a delay that includes the actual reassignment to a new judge. See 
People v. Spicuzza
, 57 Ill. 2d 152, 155 (1974); 
People v. Turley
, 235 Ill. App. 3d 917, 920 (1992); 
People v. Helton
, 153 Ill. App. 3d 726, 730 (1987). We therefore conclude that the speedy-trial period was tolled from March 14, 1994, to July 22, 1994, because of defense counsel's actions and defendant's motions.

The next period at issue is the 21-day period from August 24, 1994, to September 14, 1994. On July 22, 1994, defense counsel agreed to continue the case with respect to the pending motions until August 24, 1994, for a hearing on pending motions. On August 24, 1994, the trial court continued the case on the State's motion to September 14, 1994. The State now concedes and the record reflects that this 21-day delay is not attributable to defendant. This 21-day delay is therefore charged to the State and computed towards the speedy-trial period.

Defendant next contests the periods of delay between January 12, 1995, and January 31, 1995, and between March 3, 1995, and June 5, 1995. From September 14, 1994, to January 12, 1995, and from January 31, 1995, to March 3, 1995, hearings were held on various defense motions. Defendant now acknowledges that defense counsel agreed to those continuances. When the parties appeared on January 12, 1995, defendant's case could not be heard because the judge was in the middle of a jury trial in another case. Defense counsel was not present; however, the trial judge addressed defendant personally and informed him that “all the attorneys [had] reached a date of agreement” when the court had contacted them earlier. The 19-day delay from January 12 to January 31 cannot be charged to defendant because another trial was the cause of the delay. Defense counsel was given no choice in regard to this delay. As such, defense counsel was essentially forced to accept another date. The delay occasioned by the court's schedule cannot be attributable to defendant because the continuance was solely due to the trial judge's unavailability on January 12, 1995. See 
People v. Beyah
, 67 Ill. 2d 423, 428 (1977).

On March 3, 1995, after concluding the hearing on the defense motions, defense counsel demanded trial. The trial court, however, refused to recognize the demand because defense counsel indicated to the trial court that he intended to file death penalty motions. The trial court found that, since the defense was planning to file such motions, it was not ready to proceed to trial and that the delay caused by those motions was attributable to the defense. The trial court continued the case until March 21, 1995, to give defendant's attorney time to file sentencing motions, as well as motions challenging the constitutionality of the Illinois death penalty statute, and to allow the State time to respond. This delay was attributable to defendant even if, as defendant now claims, the motions did not require evidentiary hearings, because the State was entitled to time in which to prepare responses to defendant's numerous motions. See 
McDonald
, 168 Ill. 2d at 440-

41.

On March 21, 1995, the case was continued to March 23, 1995, on the court's motion. Because the case was continued on the court's motion, the two-day delay cannot be attributable to defendant.

On March 23, 1995, the trial judge heard and denied the sentencing motions filed by defendant. The trial court announced that June 5, 1995, would be an agreed trial date. Defense counsel agreed. The trial court also stated that there was an agreed continuance for status to May 4, 1995. Defense counsel responded: “Very good, your Honor.” On May 4, 1995, defense counsel requested to argue on June 5, 1995, a motion to dismiss the indictment on speedy-trial grounds for running of its term. The trial court allowed defense counsel's request. The trial court also stated that there was an agreed continuance of the case to June 5, 1995, for trial. This period of delay between March 23, 1995, and June 5, 1995, is chargeable to defendant because there was agreement by defense counsel to continue the date for trial to June 5, 1995. See 
Plair
, 292 Ill. App. 3d at 400 (when defense counsel expressly consents to a particular trial setting, the delay up to that date is attributable to the defendant). We therefore conclude that defendant has not established that the delays between March 3, 1995, to March 21, 1995, and March 23, 1995, to June 5, 1995, were delays caused by the prosecution. As such, these periods of time may not be counted in computing the 120-day period.

The State concedes that the 43-day delay between June 5, 1995, and July 18, 1995, is not attributable to defendant. On June 5, 1995, the trial court denied the defense motion to dismiss the indictment. The State sought a continuance because the prosecutor, a member of the United States Army Reserves, had been called for one week of active duty. Moreover, the prosecutor needed additional time to interview codefendant Joseph Rinaldi, who had decided to testify for the State against defendant and codefendant Permanian after accepting the State's plea bargain offer on May 22, 1995, and to reduce any of his statements to writing. The trial court continued the case on the State's motion to June 27, 1995, for status, and determined that this delay was attributable to the State. On June 27, 1995, the prosecutor, having completed his interviews of Rinaldi, sought more time in order to reduce his statements to writing and provide copies to defense counsel. The court continued the case until July 19, 1995, on the State's motion, and therefore the delay is chargeable to the State.

The final period of delay concerns the period between July 19, 1995, and January 25, 1996. In addressing this period of delay, it is necessary to note that defendant had charges of armed violence, aggravated battery and aggravated unlawful restraint arising out of a July 1, 1991, incident with Tammy Behenna pending against him at the time officers arrested him and charged him with the Rinaldi murder. Initially, the State elected to proceed to trial first on the Rinaldi murder case. The State, however, sought to change that election. On June 5, 1995, the State not only sought a continuance in the Rinaldi murder case but also sought to change its election and proceed first with the other pending armed violence charges for the reasons stated in the preceding paragraph. Defense counsel objected to the change of election on the basis that it was a subterfuge on the part of the State to avoid the running of the speedy-trial term in the murder case. The trial court rejected defendant's argument and found that the State was entitled to change its election. The trial court determined that the fact that Joseph Rinaldi had recently become a witness for the State was a valid reason to change the election. The trial court therefore allowed the change of election and continued the case to June 27, 1995. On June 27, 1995, in granting the State's motion to continue to July 19, 1995, the trial court reaffirmed its prior ruling that the State had a right to change its election and proceed to trial first with the armed violence charges. On July 19, 1995, defense counsel informed the court that, although it was ready to proceed in the Rinaldi murder trial, it was not ready to try the armed violence charges. The trial court therefore ruled that the running of the speedy-trial statute was tolled in the murder case until the other pending charges were tried, and the trial court continued the case to August 17, 1995, for status. The murder case was continued several times thereafter so as to determine the status of the other pending charges, which ultimately proceeded to trial on October 18, 1995. Defendant was found guilty for aggravated battery and aggravated unlawful restraint on March 21, 1996, and was sentenced on May 9, 1996. Meanwhile, defendant's trial for the Rinaldi murder commenced on January 25, 1996. 

Defendant contends that the delay between July 19, 1995, and January 25, 1996, is attributable to the State and that the trial court erroneously tolled the speedy-trial statute during this period. Defendant claims that, because the State elected to proceed on the murder case, the State was required to try him for murder within 120 days of his arrest on June 10, 1993. Defendant further claims that the State was not entitled to change its election and proceed first on the armed violence case because the State's change of election represented a subterfuge to allow it to delay trial of the murder charge. We disagree.

Where a defendant is simultaneously in custody for more than one charge, the State must bring him to trial on one of those charges within 120 days of his arrest and must try him on the remaining charge within 160 days from the rendering of judgment on the first charge. 725 ILCS 5/103–5(e) (West 1994). Section 103–5(e) thereby preserves a defendant's right to a speedy trial and also mitigates the State's burden of preparing more than one charge for trial against a single incarcerated defendant. Under section 103–5(e), the speedy-trial period on the second charge is tolled until a judgment is rendered in the first charge. The 160-day period from the entry of judgment on the first charge, however, is only tolled if the requisite circumstances occur with respect to the second charge, including a delay occasioned by the defendant or an interlocutory appeal. 725 ILCS 5/103–5(e) (West 1994); see 
People v. Brown
, 92 Ill. 2d 248, 256-57 (1982) (interlocutory appeal in one case does not toll the 160-day statutory period in another case pending against the defendant). Because the State here announced on June 5, 1995, its decision to proceed to trial first in the armed violence charges, the State was required to bring defendant to trial on those charges within 120 days given that defendant was in custody on those charges. The speedy-trial period with respect to the murder case was therefore tolled from June 5, 1995, until judgment was rendered on the armed violence charges. Once judgment was rendered, however, the State was required to bring defendant to trial for murder within 160 days. The State brought defendant to trial in the murder case before judgment was rendered in the armed violence case. Consequently, defendant was tried within the 160 days provided for in section 103–5(e).

As a final matter, we reject defendant's contention that the prosecutors engaged in an act of subterfuge calculated to occasion delay in going to trial on the murder case. We first point out that the State is not precluded from changing its election. See 
People v. Beard
, 271 Ill. App. 3d 320, 327-28 (1995) (allowing the State to change its election three times where the defendant was brought to trial within 160 days from judgment rendered on the first case); 
People v. Holmes
, 234 Ill. App. 3d 931, 939-40 (1992) (rejecting the defendant's claim that the State changed its election merely to give its expert time to revamp his findings in response to a defense challenge). If the law were to the contrary, a defendant could decide which charge should be tried first by challenging a prosecutor's legitimate reason for changing his election. In this case, the prosecutor changed his election primarily because he needed additional time in the murder case to interview codefendant Rinaldi, who had recently decided to testify for the State, and to prepare his statements. The trial court properly decided that this event constituted good cause for a change of election. The record does not show that the State changed its election as an act of subterfuge to delay proceeding to trial on the murder charge.

In sum, we find that only 97 days from defendant's arrest to commencement of his trial for murder are not attributable to defendant. We therefore conclude that the trial court did not abuse its discretion in denying defendant's motions to dismiss. Accordingly, we hold that defendant was brought to trial within the statutory periods proscribed by the speedy-trial statute.

II. Trial Issues

A. 
Opening Statements

Defendant contends that he was denied a fair trial because the prosecutor, in his opening statements, promised that various witnesses would testify as to defendant's ownership of .22-caliber handguns and then failed to produce such evidence at trial. Specifically, defendant points to the following statements by the prosecutor:

“Mr. Apel will tell you that he knew Kliner [defendant] to be the owner of several .22 caliber handguns.

* * *

You will hear also from gun dealers whose records show sales of .22 caliber handguns to Ronald Kliner. You will also hear from another witness, Tammy Behenna. You will learn from her that she is the Defendant Kliner's former girlfriend and the mother of his child. She will also tell you about the many times that she saw him with guns.”

The record reveals that, several days after the prosecutor's opening statements, defendant filed a motion to exclude testimony relating to the possession or purchase of handguns by defendant. The motion claimed that such testimony was irrelevant and prejudicial because the alleged guns had not been recovered, had been reported stolen before the murder, and had not been identified as the weapon used in the murder. Moreover, the motion noted that the only .22-caliber handgun found at defendant's residence had been tested and determined not to have been the murder weapon. The motion therefore concluded that the guns had not been shown to be connected to either defendant or the crime. At the hearings on this motion, the prosecutor explained that he was seeking to introduce into evidence records and testimony which showed that defendant had purchased two .22-caliber handguns, one in 1985 and one in 1987, to show that one of those guns possessed by defendant could have been the murder weapon given that the victim in this case was shot by a .22-caliber gun. The trial court ruled that there was an insufficient connection between these prior gun purchases and the crime and that evidence of defendant's ownership of these guns was prejudicial. The trial court therefore allowed defendant's motion to exclude this evidence.

Defendant now claims that the prosecutor's promises in opening statements of witnesses who would testify about defendant's purchase and possession of guns was reversible error because there was deliberate misconduct on the part of the prosecutor. According to defendant, the prosecutor had no good-

faith basis to assume that testimony about purchases of unidentified handguns, which had been reported stolen by defendant before this offense, and had no hint of connection to this case, could be admissible, particularly where the only gun which had been recovered from defendant had been proven not to be the murder weapon. Defendant further argues that the intentional nature of the prosecutor's misconduct is apparent in regard to the promises of Apel's and Behenna's testimony about defendant's possession of handguns. Defendant points out that the prosecutor did not attempt to inquire of Apel or Behenna about this subject matter. Defendant therefore concludes that he was prejudiced by the prosecutor's remarks because the prosecutor promised witnesses who would place the potential murder weapon in defendant's hand.

The State responds that defendant has waived this issue for review because he failed to object at trial. We need not address the State's waiver argument because waiver limits the parties' ability to raise an argument and not this court's right to entertain an argument. See 
People v. Hicks
, 181 Ill. 2d 541, 545 (1998). For this reason, we address the merits of this issue.

The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. See 
People v. Leger
, 149 Ill. 2d 355, 392 (1992). An opening statement may include a discussion of the expected evidence and reasonable inferences from the evidence. See 
Leger
, 149 Ill. 2d at 392; 
People v. Smith
, 141 Ill. 2d 40, 63 (1990). No statement may be made in opening which counsel does not intend to prove or cannot prove. See 
Smith
, 141 Ill. 2d at 63. As such, it is improper for counsel to make opening statements about testimony to be introduced at trial and then fail to produce that evidence. See 
People v. Thompkins
, 121 Ill. 2d 401, 422 (1988). Nevertheless, it is not always grounds for reversal when an opening statement refers to evidence which later turns out to be inadmissible. Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor 
and 
result in substantial prejudice to the defendant. See 
Smith
, 141 Ill. 2d at 64.

In the present case, the prosecutor's remarks regarding testimony relating to defendant's prior possession or purchase of .22-caliber handguns were improper because such matters were not later proven given the trial court's granting of defendant's motion to exclude such evidence at trial. We also agree with defendant that the prosecutor did not have a good-faith basis to believe that the evidence regarding the guns would be admitted. The prosecutor should have known that he could not demonstrate that the .22-caliber handguns allegedly purchased by defendant were sufficiently connected with the murder and defendant so as to permit testimony about them into evidence. See 
People v. Free
, 94 Ill. 2d 378, 415-18 (1983); 
People v. Yelliott
, 156 Ill. App. 3d 601, 602-03 (1987). As noted, Dana Rinaldi was murdered by a .22-caliber weapon; however, the two .22-caliber handguns allegedly owned by defendant, and about which the State sought to introduce evidence, had not been recovered, had been purchased years prior to the offense, and had been reported stolen before the murder. Consequently, the prosecution could not have shown that defendant had access to such weapons around the time of the murder. The prosecutor's statements, however, did not amount to reversible error. The prosecutor's remarks regarding these handguns did not result in substantial prejudice to defendant. The trial court instructed the jury both before opening statements and at the conclusion of the evidence that opening statements are not evidence and that the jury should disregard any statements not supported by the evidence. Moreover, the prosecutor presented no evidence concerning defendant's alleged prior possession and purchases of .22-caliber handguns to the jury. The prosecutor properly did not question Apel and Behenna about defendant's prior gun ownership in compliance with the court's order excluding such evidence. We therefore conclude that the prosecutor's opening statements did not deny defendant a fair trial.

B. 
Cross-Examination

Defendant challenges the trial court's limitation of defense counsel's cross-examination of two of the State's witnesses and argues that such limitation amounted to reversible error because of the witnesses' importance to the State's case.

Defendant first argues that he was deprived of his constitutional right to confront and cross-examine State witness Joseph Rinaldi by the trial court's refusal to allow him to elicit additional information from Rinaldi regarding his alleged use of tranquilizers during his testimony at trial.

The record discloses that, several days following Rinaldi's testimony, defense counsel informed the trial court at a side bar conference that one of the prosecutors had been overheard telling police officers that Rinaldi had been tranquillized. The prosecutor emphatically denied such an allegation. At a hearing held outside of the jury's presence, Mary Permanian, codefendant's mother, testified that, during a break in the trial, she had overheard detectives ask the prosecutor in the hallway outside the courtroom how the prosecutor had gotten Rinaldi to remain calm, to which the prosecutor replied “we had him tranquilized.” According to Mrs. Permanian, the prosecutor and the officers thought it was a big joke, and had smiles on their faces during this conversation. On cross-examination, Mrs. Permanian admitted that she could not remember the date when the conversation allegedly took place, and that she had waited several days before informing defense counsel about the conversation. Mrs. Permanian also could not name or describe the officers in any detail. The prosecutor testified that he did not make this statement, did not have any knowledge that Rinaldi was taking tranquilizers during his testimony, and did not discuss Rinaldi's testimony with the officers. Defense counsel moved to have Rinaldi returned to court for further examination, and for production of the jail's medication records for Rinaldi. The trial court denied each of these requests. The trial judge explained that she did not believe an accusation made by a codefendant's mother, who could not remember when the statement was allegedly made, and who admitted that she did not report this incident for several days. Moreover, the trial judge found that the State had refuted the testimony of Mrs. Permanian.

Defendant challenges the trial court's refusal to allow him to recall Rinaldi as an improper restriction of cross-examination. Defendant claims that he should have been allowed to cross-

examine Rinaldi as to this issue because Rinaldi's use of tranquilizers was relevant to his credibility.

A criminal defendant has a fundamental constitutional right to confront the witnesses against him, which includes the right to cross-examination. See 
Davis v. Alaska
, 415 U.S. 308, 315, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110 (1974); 
People v. Triplett
, 108 Ill. 2d 463, 474 (1985). Any permissible matter which affects the witness's credibility may be developed on cross-examination. See 
People v. Kitchen
, 159 Ill. 2d 1, 37 (1994). This court has held that drug addiction of a witness at the time of testifying or at the time that an event occurred is a proper subject of cross-

examination and may be used in an attempt to diminish a witness' credibility. See 
People v. Collins
, 106 Ill. 2d 237, 270 (1985); 
People v. Strother
, 53 Ill. 2d 95, 99 (1972). Nevertheless, the latitude permitted on cross-examination is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. See 
Kitchen
, 159 Ill. 2d at 37; 
People v. Enis
, 139 Ill. 2d 264, 295 (1990).

The trial court did not abuse its discretion in precluding cross-

examination of Rinaldi regarding his alleged use of tranquilizers. Defendant did not provide an adequate foundation to support his claim that Rinaldi had been on tranquilizers at the time of his testimony. In light of the testimony of both Mrs. Permanian and the prosecutor, we agree with the trial court that the State refuted the defendant's allegations. Therefore, additional inquiry into Rinaldi's alleged use of tranquilizers was not warranted. See 
People v. Crisp
, 242 Ill. App. 3d 652, 660 (1992) (finding defense counsel was properly precluded from cross-examining the witness regarding the witness's alleged drug use because he failed to lay a proper foundation). Parenthetically, we note that defense counsel was able to cross-examine Rinaldi extensively about any motivation for lying and display to the jury whether or not Rinaldi was worthy of belief.

Defendant also claims that he was deprived of his constitutional right to confront and cross-examine State witness Tammy Behenna by the trial court's refusal to allow him to question Behenna about her current name, address, place of employment, and social security number.

The record discloses that, prior to Behenna's taking the stand, the State filed a motion 
in limine
 to bar defendant from questioning Behenna about her new name, new home address, new place of employment, and new social security number. In support of its motion, the State asserted that such matters were neither relevant nor material, and that disclosure might compromise the safety of Behenna, who had been placed in the witness protection program. Defense counsel countered that such information was relevant for cross-examination, and that such information was necessary to continue investigative efforts regarding Behenna's background. Defense counsel further argued that disclosure was necessary to show Behenna's interest and bias given the ongoing visitation battle between Behenna and defendant's family regarding defendant and Behenna's young son. The trial court granted the State's motion on the basis that such information was not relevant to establishing Behenna's interest and bias. The trial court, however, ruled that defense counsel could ask Behenna if she had changed her name and address, and whether she had entered the witness protection program.

Defendant now asserts that he was entitled to the disclosure of this information regarding Behenna so as to properly investigate her. In support of his argument, defendant relies on the United States Supreme Court's decision in 
Smith v. Illinois
, 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748 (1968). In 
Smith
, the trial court refused to allow the defense to inquire about the real name and address of the State's witness, who was both an informant and participant in the illegal sale of narcotics. The Supreme Court found this to be reversible error because the defendant was denied his right to confront a witness against him. The Court reasoned that when the credibility of a witness is at issue, the very starting point in exposing falsehood and bringing out the truth through cross-examination is to ask the witness who he is and where he lives because the witness' name and address open avenues of in-

court examination and out-of-court investigation. 
Smith
, 390 U.S. at 131, 19 L. Ed. 2d at 959, 88 S. Ct. at 750.

Initially, we note that the circumstances of this case are distinguishable from those in 
Smith
. Unlike in 
Smith
, Behenna is neither an informant nor a participant in the murder. Instead, the record reveals that Behenna is a witness whom defendant knew quite well. Moreover, there was evidence that Behenna's safety was a concern. The State informed the trial court that Behenna was in the witness protection program, which itself implies an issue of safety. It is evident that cross-examining Behenna about her current name, address, place of employment or social security number might have endangered her personal safety. See 
People v. Lewis
, 57 Ill. 2d 232, 237 (1974) (an informer should not be forced to disclose his name and address at trial on cross-

examination if his life or safety is in jeopardy). We therefore find that the trial court did not abuse its discretion in precluding defense counsel from making the aforementioned inquiries of Behenna because sufficient evidence was presented at trial that Behenna's safety was an issue. Parenthetically, we note that testimony at defendant's sentencing hearing supported the State's concern for Behenna's safety even after defendant's incarceration in Cook County jail in April of 1992. The record at sentencing reveals that defendant hired inmate Charles Russell sometime in 1993 to find someone to kill Behenna because she was prepared to testify against him in this case and another case pending against defendant.

In a related argument, defendant contends that the trial court improperly deprived him of his right to cross-examine Behenna about the terms of the visitation order regarding defendant and Behenna's son. During cross-examination of Behenna, defense counsel questioned her about the ongoing litigation between Behenna and defendant's family, namely that defendant's mother was seeking visitation rights with Behenna's son. After Behenna denied that defendant's mother had been granted visitation, defense counsel sought to question Behenna about the specific terms of a visitation order. The trial court refused to allow defense counsel to ask Behenna additional questions regarding the order. More specifically, the court refused to allow defense counsel to inquire: (1) whether Behenna had disobeyed a visitation order; (2) whether Behenna had brought the child to visit defendant's mother pursuant to the order; (3) whether defendant's mother had ever seen the child; and (4) whether Behenna had told numerous persons that members of defendant's family would never see the child. Nevertheless, the trial court allowed defense counsel to prove that defendant's mother had filed a petition seeking visitation, which was pending at the time of defendant's trial.

Defendant argues that the trial court's ruling prevented him from adequately informing the jury of the extent of Behenna's bias against him and motivation to offer false testimony. According to defendant, cross-examination as to the terms of the visitation order would show that Behenna had a motive to testify falsely, namely, to defeat defendant's family's attempts to gain visitation rights with her son.

A defendant has the right to cross-examine a witness concerning bias, interest or motive to testify falsely. See 
Davis
, 415 U.S. at 316, 39 L. Ed. 2d at 354, 94 S. Ct. at 1110; 
Kitchen
, 159 Ill. 2d at 37; 
People v. Harris
, 123 Ill. 2d 113, 144 (1988). The confrontation clause, however, does not prevent the trial judge from imposing limits on defense counsel's inquiry into potential bias of a witness. We have held that a trial judge retains wide latitude to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance. See 
Delaware v. Van Arsdall
, 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435 (1986); 
Harris
, 123 Ill. 2d at 144. The United States Supreme Court observed in 
Delaware v. Fensterer
, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985), that “the Confrontation Clause guarantees an 
opportunity
 for effective cross-examination, not cross-

examination that is effective in whatever way, and to whatever extent, the defense might wish.” (Emphasis in original.) Moreover, the improper denial of a defendant's constitutional right to cross-

examine a witness regarding bias does not always mandate reversal, but may be found to be harmless error. See 
Van Arsdall
, 475 U.S. at 684, 89 L. Ed. 2d at 686, 106 S. Ct. at 1438.

Here, the trial court permitted defense counsel to question Behenna about defendant's family's attempts to obtain visitation rights with Behenna's son. The trial court merely limited defense counsel's inquiry into the terms of a visitation order. Despite this restriction, defense counsel was able to elicit from Behenna that there was ongoing litigation between herself and defendant's family regarding visitation rights with her son. This evidence was more than sufficient to point out to the jury Behenna's potential bias against defendant. We note, furthermore, that defendant was permitted a full cross-examination of Behenna in other respects. The jury was advised of information with which to make an informed decision about Behenna's motivation for offering false testimony. The jurors were informed that Behenna and defendant had ended their relationship. The jurors were also informed that Behenna had a sexual relationship with codefendant Permanian in 1991. In the context of this case, the restriction placed on defendant's cross-examination of Behenna by the trial court was minor. Therefore, we find that, even if the trial court erred in limiting Behenna's cross-examination regarding the terms of the visitation order, the error was harmless beyond a reasonable doubt.

C. 
Conspiracy Conviction

Defendant claims that his conspiracy conviction must be vacated because the statute of limitations for conspiracy had expired prior to the filing of the indictment, and the conspiracy allegation was insufficiently pled in the indictment. We need not consider these claims because no judgment on the conspiracy count was entered against defendant. Conviction is defined as a “judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury.” 720 ILCS 5/2–5 (West 1996); 730 ILCS 5/5–1–5 (West 1996). Judgment means “an adjudication by the court that the defendant is guilty or not guilty, and if the adjudication is that the defendant is guilty, it includes the sentence pronounced by the court.” 730 ILCS 5/5–1–12 (West 1996). Thus, a jury verdict is not a judgment of conviction because only the trial judge renders a judgment in a case. Here, the jury returned guilty verdicts for the conspiracy and murder counts; however, the trial judge did not enter a judgment of conviction or a sentence with regard to the conspiracy verdict. Instead, the trial judged entered an adjudication that defendant is guilty of first degree murder and sentenced him to death for that offense. We note that the trial judge's decision is consistent with the well-

established principle that a defendant cannot be convicted of both the inchoate offense (
i.e
., conspiracy) and the principal offense (
i.e
., murder). 720 ILCS Ann. 5/8–5, Committee Comments–1961, at 519-20 (Smith-Hurd 1993); see 
People v. St. Pierre
, 146 Ill. 2d 494, 519 (1992). Given that there is no conspiracy conviction to vacate, there is also no reason to remand for resentencing, as advocated by defendant.

D. 
Conspiracy Evidence

Defendant also challenges the admission, through the testimony of Joseph Rinaldi, of several statements by defendant and Permanian regarding the conspiracy. Defendant claims that Joseph Rinaldi's testimony about preoffense and post-offense statements by defendant and codefendant Permanian was inadmissible because the State's evidence did not conform to the time limitations placed upon it by the bill of particulars. Prior to Rinaldi's testimony at trial, defendant filed a motion to exclude portions of Rinaldi's testimony which related to statements made by defendant and Permanian before and after February 18, 1988, which was the date on which the offenses of murder and conspiracy allegedly occurred pursuant to the bill of particulars. Defendant argued that he was surprised by that evidence because it was beyond the scope of the bill of particulars on which defendant relied in preparing his case. The trial court denied defendant's motion on the basis that the defense was not taken by surprise because the State tendered such statements to the defense prior to trial.

Rinaldi thereafter testified about meetings and conversations with defendant and Permanian before and after February 18, 1988. Rinaldi testified that, beginning in November of 1987, there were a series of meetings between him and Permanian. During these meetings, Permanian made statements that suggested the development of a plan by Permanian, Rinaldi and defendant to murder Dana Rinaldi. Rinaldi also testified about meetings with Permanian and defendant at which defendant agreed to murder Rinaldi's wife in exchange for a portion of the insurance proceeds. According to Rinaldi, defendant requested background information about Dana Rinaldi regarding her place of employment, work hours, and the location of their home, including the layout of their apartment complex, which defendant and Permanian indicated would be the best place to commit the murder. Rinaldi also testified about statements made by Permanian following the murder. These statements related to defendant's and Permanian's threats to Rinaldi, their efforts to collect the insurance proceeds from Rinaldi, including a payment schedule, and a plan to convert traveler's checks into cash in Las Vegas.

Defendant now contends that the trial court erred by allowing Rinaldi's testimony about defendant's and Permanian's statements because these statements varied from the date of the murder and conspiracy set forth in the bill of particulars.

Section 111–6 of the Code of Criminal Procedure (725 ILCS 5/111–6 (West 1996)) provides that the trial court has discretion to require the State to furnish the defendant with a bill of particulars containing such particulars of the offense as may be necessary for the preparation of the defense. That section further states that “[a]t the trial of the cause the State's evidence shall be confined to the particulars of the bill.” The purpose of the bill of particulars in criminal prosecutions is to give the defendant notice of the charge against him and to inform him of the particular transactions brought in question so as to enable the defendant to prepare his defense. See 
People v. Westrup
, 372 Ill. 517, 518 (1939); 21A Ill. L. & Prac. 
Indictments and Informations
 §59 (1977). In general, the State is confined in its proof to the matters set forth in the bill of particulars; however, a bill of particulars limits the evidence only as to the matters that it purports to particularize and does not limit the introduction of evidence tending to prove such matters. See 30 Ill. L. & Prac. 
Pleading
 §243 (1993). Although the bill of particulars limits the State's evidence to transactions set out in the bill, the State is not required to disclose in the bill all of the evidence that will be offered in support of the charge. See 
Westrup
, 372 Ill. at 519; 
People v. Seawright
, 228 Ill. App. 3d 939, 969 (1992). In fact, any evidence tending to establish the transactions set forth in the bill of particulars is admissible. See 
People v. Depew
, 237 Ill. 574, 578 (1908). Moreover, a variance between the bill of particulars and the evidence at trial does not result in reversible error where the defendant has not been misled or prejudiced in the preparation of his defense. See 
People v. Suter
, 292 Ill. App. 3d 358, 364 (1997); 
People v. Paik
, 257 Ill. App. 3d 620, 625-26 (1993); 21A Ill. L. & Prac. 
Indictments and Informations
 §83 (1977), 30 Ill. L. & Prac. 
Pleading
 §245 (1993).

In this case, it is clear from the information relayed in the statements at issue that the State introduced those statements to support its charge of conspiracy to commit murder on the part of defendant. The offense of conspiracy arises where a person with intent that an offense be committed agrees with another to the commission of that offense and an act in furtherance of such agreement is alleged and proved to have been committed by that person or by a coconspirator. 720 ILCS 5/8–2 (West 1996). Consequently, conspiracy involves a criminal agreement to commit a separate criminal act or acts. The bill of particulars provided that the date of the conspiracy was on or about February 18, 1988. Given that Rinaldi's testimony referred to events and statements which were made before and after that date, there was indeed a variance between the evidence presented by Rinaldi and the date of the conspiracy specified in the bill of particulars. However, we find that the trial court's ruling allowing Rinaldi's testimony despite that variance was not error. The preoffense statements laid a foundation for the conspiracy, and the post-

offense statements indicated the ongoing nature of the conspiracy, which included obtaining insurance proceeds. Moreover, the trial court indicated that the State tendered Rinaldi's statements to the defense during pretrial discovery. The State's answer to discovery also provided that written or recorded statements and summaries of oral statements of codefendants, which included Rinaldi, were given to the defense. In view of these circumstances, we are not persuaded that defendant was misled or prejudiced in the preparation of his defense due to any variance between the date set forth in the bill of particulars and the evidence presented by the State. We therefore conclude that any variance did not amount to reversible error.

 In a related claim, defendant argues that the trial court erred in ruling that the coconspirator exception to the hearsay rule permitted Rinaldi to testify about hearsay statements of Permanian occurring after Dana Rinaldi's murder. The following testimony by Rinaldi is at issue.

On February 18, 1988, several hours after the murder, Rinaldi called Permanian in accordance with their prior agreement. Rinaldi told Permanian that his wife, Dana, had been murdered and Permanian indicated that he knew because he had been listening to the news. Permanian asked Rinaldi how he had fared with the police, and Rinaldi admitted that he had told the police that Permanian owned a red sports car. When Permanian became upset, Rinaldi reminded him that he had originally planned to use a stolen car to commit the murder. Permanian responded that “he and Ron [defendant] had used his [Permanian's] car, and it was all over the news.”

During a second conversation between Rinaldi and Permanian, which occurred sometime in March of 1988, Permanian angrily reported that officers had contacted him about Dana's murder. Permanian blamed Rinaldi for the police involvement because Rinaldi had told them about Permanian's red sports car. Rinaldi responded by telling Permanian that he was supposed to steal a car and make the murder look like a robbery. Permanian in turn responded that “Ron couldn't get the purse out of her hand, and it looked like one of the shots may have hit it.” During this conversation, Permanian demanded payments for the murder. Shortly after this conversation, Rinaldi began making payments to Permanian and defendant.

Defendant also challenges additional statements in which Rinaldi and Permanian discussed Permanian's and defendant's demands for money, payment schedules, distribution of the insurance proceeds, and threats to kill Rinaldi. One such conversation occurred in August of 1989, when Permanian told Rinaldi that defendant wanted the remainder of the money owed to him. Permanian stated to Rinaldi that “Kliner [defendant] wanted his money by the end of the month, the end of August, or that he [defendant] was going to kill me [Rinaldi].” This conversation led to another conversation involving a gambling scheme to convert traveler's checks to cash in Las Vegas.

It is defendant's contention that the preceding statements were not admissible under the coconspirator exception to the hearsay rule because they were made beyond the pendency of the conspiracy and did not further the conspiracy. Instead, these statements merely served to incriminate defendant. Defendant therefore concludes that the admission of these statements through Rinaldi's testimony violated his constitutional rights under the confrontation clause of the sixth amendment.

We find that Permanian's statements were admissible under the coconspirator exception to the hearsay rule. Pursuant to this hearsay exception, any declaration by one coconspirator is admissible against all conspirators where the declaration was made during the pendency of and in furtherance of the conspiracy. See 
People v. Goodman
, 81 Ill. 2d 278, 283 (1980). The coconspirator hearsay exception does not extend to a statement which is merely a narrative of past occurrences and which does not further any objective of the conspiracy. See 
People v. Byron
, 164 Ill. 2d 279, 290 (1995). Statements made in furtherance of a conspiracy include those that have the effect of advising, encouraging, aiding or abetting its perpetration. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §802.10 (6th ed. 1994). Statements relating to attempts at concealment further the objective of the conspiracy, which implicitly includes escaping punishment. Moreover, subsequent efforts at concealment of the crime, where sufficiently proximate in time to the offense, are considered as occurring during the course of the conspiracy. See 
People v. Thomas
, 178 Ill. 2d 215, 238 (1997).

Here, Permanian's statement to Rinaldi regarding the use of Permanian's car during the murder occurred the same day as the murder and, as such, was proximate in time to the commission of the underlying offense of murder. Permanian's statement went beyond a mere narrative of a past event. Rather, it was directed toward persuading Rinaldi to remain silent by explaining the alteration of the original plan with respect to using a stolen car. Consequently, Permanian's statement expressed his desire to conceal the conspiracy by encouraging Rinaldi not to reveal further information to the police. Because Permanian's statement was made in furtherance of an effort at concealment, the statement was also made in furtherance of the conspiracy. 
Cf
. 
People v. Parmly
, 117 Ill. 2d 386, 394-95 (1987) (codefendant's hearsay statement that the defendant fired the fatal shot was not admissible under the coconspirator exception because the statement was not made in furtherance of any effort at concealment, and it was a mere attempt by the declarant to place the principal blame for the murder on the defendant). We therefore determine that this statement was properly admitted pursuant to the coconspirator hearsay exception.

The remainder of Permanian's statements concern the collection of the payment for the murder. This court has found that statements made in an effort to obtain payment for the murder are admissible under the coconspirator hearsay exception. See 
People v. Byron
, 164 Ill. 2d 279 (1995). In 
Byron
, this court was presented with a murder-for-hire scheme in which a codefendant testified about hearsay statements made by another codefendant after the murder. These statements revealed details of the murder, demands for payment and threats. We held that the trial court did not err in admitting testimony concerning these statements, which were made during the course of and in furtherance of the conspiracy. 
Byron
, 164 Ill. 2d at 290-91. We reasoned that the conspiracy did not end with the victim's murder because the ultimate goal of the conspiracy was for the defendant and codefendants to obtain money as payment for the murder. 
Byron
, 164 Ill. 2d at 291. The conversations between the codefendants following the murder were calculated to further such financial interests, and the recitations about the murder were inextricably intertwined with the requests for money. 
Byron
, 164 Ill. 2d at 291.

Defendant contends that the holding in 
Byron
 cannot be applied to this case. We reject this contention. Although the statements in 
Byron
 were made within one week of the offense, the holding in that case is not premised on that fact. The statements in 
Byron
 were admissible not because they were made shortly after the murder, but because they were made during and in furtherance of the conspiracy.

In the case before us, as in 
Byron
, a conspirator (Permanian) discussed certain details about the commission of the murder in his attempts to obtain payment for the murder. Permanian's statements were not merely a narrative of past details of the crime. Rather, Permanian's statements were made during the course of and in furtherance of the conspiracy. The conspiracy did not end with Dana Rinaldi's murder on February 18, 1988, because the conspiracy encompassed obtaining the insurance proceeds. See 
Ramey
, 151 Ill. 2d at 528 (the conspiracy included invading the victim's house, taking the electronic equipment, and selling it). The real objective of the conspiracy included Permanian's and defendant's obtaining the insurance proceeds from Rinaldi as payment for the murder. At the time of Permanian's statements, this goal of the conspiracy had not been accomplished. Permanian's statements served to further an objective of the conspiracy, namely, to obtain payment for the murder. Even Permanian's statement regarding Dana Rinaldi's purse was attributable to his attempts to obtain payment because it sought to encourage Rinaldi to pay Permanian and defendant for the murder despite the fact that the attempt to make it look like a robbery had failed. Under these circumstances, Permanian's statements were made in the course of the conspiracy and to advance the ultimate goal of the conspiracy. As we determined in 
Byron
, Permanian's statements were inextricably intertwined with the continued requests for compensation from Rinaldi. Accordingly, we conclude that Permanian's statements made in the context of receiving payment from Rinaldi were admissible under the coconspirator exception to the hearsay rule.

As a final matter on this issue, we reject defendant's claim that the admission of Permanian's statements violated the holding in 
Bruton v. United States
, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). In 
Bruton
, the Supreme Court held that the defendant was deprived of his rights under the confrontation clause of the sixth amendment when his codefendant's post-arrest confession, which incriminated the defendant, was admitted at their joint trial. In reaching its decision, the Court acknowledged that there was no recognized exception to the hearsay rule before it. 
Bruton
, 391 U.S. at 128 n.3, 20 L. Ed. 2d at 480 n.3, 88 S. Ct. at 1623 n.3. The circumstances of this case are distinguishable from those in 
Bruton
. Here, unlike 
Bruton
, the statements at issue do not involve a custodial confession by Permanian, and the statements were admissible under the coconspirator hearsay exception. Permanian's statements were also generally made under circumstances that indicate their reliability including that Permanian had personal knowledge of the incident, it was unlikely that Permanian's statements were founded upon a faulty recollection, the statements were against Permanian's penal interest given their context, and the statements did not contain any express factual assertion of defendant's guilt but only an inference of guilt. See 
Dutton v. Evans
, 400 U.S. 74, 87-89, 27 L. Ed. 2d 213, 226-27, 91 S. Ct. 210, 219-20 (1970) (holding that the sixth amendment confrontation clause was not violated by the admission of hearsay statements under a Georgia statute permitting an exception for statements by coconspirators where there was sufficient indicia of reliability supporting the truth of the statements); 
Goodman
, 81 Ill. 2d at 284-85 (finding hearsay statements admissible because there was sufficient indicia of reliability). Moreover, defendant was able to confront and cross-examine Rinaldi, who testified about the statements. See 
Ramey
, 151 Ill. 2d at 528 (holding that the confrontation clause of the sixth amendment is not violated by the admission of hearsay statements under the coconspirator exception to the hearsay rule, where the defendant was able to confront and cross-examine the witness who claimed that the statements at issue were made); 
Goodman
, 81 Ill. 2d at 284 (same). We therefore conclude that the use of Permanian's statements at defendant's trial did not deny defendant his constitutional rights under the confrontation clause of the sixth amendment.

E. 
Evidence of Another Crime

Defendant argues that the trial court committed reversible error in allowing the State to elicit from its witness evidence that defendant committed another crime.

On direct examination, Tammy Behenna, defendant's former girlfriend, testified about inculpatory statements made to her by defendant regarding the Rinaldi murder. Behenna indicated that she moved out of defendant's apartment on July 1, 1991, and began cooperating with law enforcement officials on September 13, 1991, with regard to the Rinaldi murder. On cross-

examination, defense counsel elicited from Behenna that on July 1, 1991, there was an “occurrence” between her and defendant that led to her filing of a complaint and defendant's arrest in September of 1991. Defense counsel further elicited that, although Behenna had been in court on several occasions seeking orders of protection against defendant, she had not included her alleged knowledge about defendant's role in the Rinaldi murder in the orders of protection and had not informed any of the judges before whom she appeared about that matter. On redirect examination, the prosecutor asked Behenna why she had sought the orders of protection against defendant. Defense counsel's objection was overruled. Behenna responded that “there was an incident in July when he pistol whipped me.” Defense counsel moved for a mistrial. The trial court denied the motion for mistrial and ruled that defense counsel on cross-examination opened the door regarding the orders of protection and that the jury had a right to know the allegations surrounding those orders.

Defendant claims that it was impermissible for the trial court to permit the jury to hear that defendant had allegedly pistol-

whipped Behenna because such evidence was not relevant to establish any material question.

In general, evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime. See 
People v. Thingvold
, 145 Ill. 2d 441, 452 (1991); 
People v. Illgen
, 145 Ill. 2d 353, 364 (1991). Evidence of the defendant's commission of other crimes is admissible, however, where relevant to prove any material question other than the defendant's propensity to commit crime, including 
modus operandi
, intent, identity, motive, or absence of mistake. See 
Thingvold
, 145 Ill. 2d at 452; 
Illgen
, 145 Ill. 2d at 364-65. In considering the admissibility of other-crimes evidence, the trial judge must weigh its probative value against its prejudicial effect on the defendant, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. See 
Illgen
, 145 Ill. 2d at 365. The trial court's ruling as to the admissibility of other-crimes evidence will not be reversed absent a clear showing of abuse of discretion. See 
Illgen
, 145 Ill. 2d at 364.

Applying these principles to the case at bar, we conclude that the trial judge abused her discretion in admitting evidence that defendant had pistol-whipped Behenna. Although defense counsel referred to the orders of protection on cross-examination, he did not introduce the details surrounding those orders. Rather, he referred generally to the orders to show that Behenna did not discuss defendant's involvement in the Rinaldi murder in the context of those orders. In essence, defense counsel attempted to discount Behenna's testimony by showing that she did not make a prompt revelation to authorities even when she had the opportunity. On redirect, the prosecutor indicated that the purpose of discussing the basis of the orders of protection was to show that Behenna maintained her silence because of her fear of defendant. The prosecutor attempted to rehabilitate Behenna by showing that she was afraid of defendant; however, there was no reason to introduce to the jury that defendant had allegedly pistol-whipped Behenna. Such details of the other crime were not relevant to establish any material question because the prosecutor could have accomplished his purpose without referring to those details. Moreover, we find that the prosecutor introduced the pistol-

whipping incident to enhance the credibility of Behenna by showing that defendant is a bad person who has a propensity to commit crime. Evidence of other crimes cannot be admitted to enhance the credibility of a witness. See 
People v. Romero
, 66 Ill. 2d 325, 330-31 (1977). For these reasons, it was improper for the trial judge to admit the details of the pistol-whipping incident. See 
People v. Cortes
, 181 Ill. 2d 249, 285 (1998).

Despite the erroneous admission of this evidence, we find this error to be harmless beyond a reasonable doubt. The evidence regarding defendant's alleged pistol-whipping of Behenna was not so prejudicial as to deny defendant a fair trial. See 
Cortes
, 181 Ill. 2d at 285-86 (finding the erroneous admission of certain details of other-crimes evidence to be harmless error). We find that the error is unlikely to have influenced the jury's verdicts such that its admission does not warrant reversal. As noted above, Behenna admitted on cross-examination that there is ongoing litigation between her and defendant's family regarding visitation rights with the child she had with defendant. On re-cross-examination, defense counsel admitted and published to the jury a number of photographs taken at family parties in July of 1991, in which Behenna bears no visible signs of injury. Defense counsel also elicited from Behenna that she was merely given Tylenol and did not receive X-rays following the alleged pistol-whipping incident. Defense counsel also showed that Behenna sent affectionate letters and a Christmas present to defendant after the alleged incident. Additional re-cross-examination elicited information that all orders of protection against defendant were eventually terminated. Consequently, defense counsel was able to again challenge Behenna's credibility with respect to the pistol-whipping incident such that any reference to that incident was not likely to have materially influenced the jury's decision. We therefore find that defendant was not prejudiced and was not denied a fair trial because of the admission of the alleged pistol-whipping incident.

In a related claim, defendant contends that the trial court abused its discretion in precluding him from eliciting from Behenna that defendant had been acquitted of armed violence for the pistol-whipping incident. At the time of Behenna's testimony, the case against defendant regarding the pistol-whipping incident was pending. Although the armed violence charge had been dismissed, the trial proceeded against defendant on the remaining two charges of aggravated battery and aggravated unlawful restraint. Defendant was found guilty of those charges after the jury returned a verdict of guilty against defendant in the instant case. We find that defendant was not prejudiced by the trial court's ruling because the jury was also not informed that a trial was proceeding against defendant on the remaining counts. Moreover, the jury heard defendant's outburst in court that he had been found not guilty of pistol-whipping Behenna.

F. 
Hearsay Statements

Defendant contends that this court should order a new trial because prejudicial hearsay testimony was erroneously admitted at trial.

On direct examination, John Apel, Sr., a witness for the State, testified that defendant had confessed to him in May of 1988 about the Rinaldi murder. During cross-examination, Apel recalled two occasions in March of 1993, when investigating officers interviewed him. On both occasions, he told the investigating officers that he had no “first hand” knowledge of the Rinaldi murder. He also told them that he had received all of his information about the case from Joe Splindorio, his father-in-law and defendant's grandfather. Apel then admitted on cross-

examination that those statements to the investigating officers were false. Apel claimed to be afraid of defendant. Apel also admitted on cross-examination that in May of 1993, he finally told law enforcement officials about defendant's confession to him, following defendant's incarceration in Cook County jail.

On redirect examination, the prosecution attempted to elicit Apel's testimony about a conversation he had with Splindorio. The trial judge found that defense counsel's cross-examination of Apel had “opened the door with regard to him [Apel] garnering his information from Splindorio.” The trial judge therefore ruled, over defense objection, that the prosecutor could ask Apel if he had a conversation with Splindorio and if he gave out information that he gleaned from that conversation. The trial judge, however, precluded the prosecutor from going into the actual contents of the conversation. The following exchange thereafter occurred between the prosecutor and Apel on redirect examination:

“Q. *** [D]id you ever have a conversation with Mr. Splindorio regarding the things you have testified to here?

A. Yes.

Q. And did you relay any of those facts or knowledge that you gleaned from that conversation to the police?

A. Yes, I did.”

Defendant now claims that Apel's testimony regarding this conversation was hearsay because the jury could deduce that defendant had made inculpatory statements to Splindorio, and Splindorio was not called as a witness. According to defendant, such hearsay testimony was erroneously admitted since no exception to the hearsay rule applied. Defendant further claims that he was prejudiced by the admission of such hearsay because the testimony not only suggested to the jury that defendant made inculpatory statements to a close confidant, but also corroborated Apel's testimony. The State argues that defendant has waived this issue for review because he failed to raise it in his post-trial motions. Because we choose to address the merits of defendant's argument, we need not decide whether this issue has been waived.

Hearsay testimony is an out-of-court statement offered in court to prove the truth of the matter asserted. See 
People v. Edwards
, 144 Ill. 2d 108, 161 (1991). Where an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is admissible. See 
People Albanese
, 102 Ill. 2d 54, 70 (1984); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.5 (6th ed. 1994). We agree with the State that Apel's testimony did not improperly introduce statements by Splindorio, but established simply that a conversation had occurred between Apel and Splindorio. Defense counsel opened the door on cross-

examination to the conversation with Splindorio by suggesting that Apel never had the conversation with him. Consequently, the statement itself had legal significance on redirect since the State sought to rehabilitate Apel's credibility by proving that Apel had a conversation with Splindorio. Apel's testimony about the conversation, however, was not offered to establish the truth of the matters asserted in the conversation. It was offered only to show that Apel and Splindorio had a conversation. We therefore reject defendant's claim that he was denied a fair trial by the erroneous admission of hearsay testimony.

G. 
Closing Arguments

Defendant claims that the prosecutor made a number of improper and prejudicial remarks during closing and rebuttal arguments. Defendant insists that the prosecutor's remarks deprived him of a fair trial and therefore warrant a new trial.

We initially note that the State claims that defendant has waived his challenge to most of the comments about which he now complains by failing to object to the comments at trial. We, however, choose to address the merits of defendant's argument, and therefore need not decide whether this issue has been waived.

It is well established that the prosecutor is afforded wide latitude in closing argument and may argue to the jury facts and reasonable inferences drawn from the evidence. See 
People v. Enis
, 163 Ill. 2d 367, 407 (1994); 
Kitchen
, 159 Ill. 2d at 38; 
People v. Edgeston
, 157 Ill. 2d 201, 219 (1993); 
Smith
, 141 Ill. 2d at 60. It is, however, improper for the prosecutor to argue assumptions or facts not based upon the evidence in the record. See 
Smith
, 141 Ill. 2d at 60. The trial court has discretion to determine the proper character, scope and prejudicial effect of closing arguments. See 
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993); 
People v. Peeples
, 155 Ill. 2d 422, 483 (1993). Improper remarks warrant reversal only where they result in substantial prejudice to the defendant, considering the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. See 
Peeples
, 155 Ill. 2d at 483; 
Smith
, 141 Ill. 2d at 60.

Defendant first contends that the prosecutor improperly commented on defendant's failure to produce certain evidence and witnesses. In closing argument, the prosecutor made the following remarks regarding the production of evidence:

“Yeah, you heard all kinds of things about well, where is the bank records. Well, of course, the defense felt that there is something to these bank records. They, too, can subpoena them.”

Defense counsel objected, and the trial court instructed the jury to disregard anything that was not evidence, and that counsel's arguments were not evidence.

The prosecutor, in rebuttal, made similar arguments regarding the production of witnesses:

“Mr. Lynch [defense counsel] keeps telling you about things like where is Sergeant Dornbos? Where are the records that are kept by the banks ***

Now, it is true the burden of proof is on us, but nobody, ladies and gentlemen–there is a thing–know this. There is a thing called a subpoena, and he has the right to subpoena any witness he wants to and he called Russell to the stand.

* * *

He could have subpoenaed Sergeant Dornbos and he could have subpoenaed the bank records if he thought they would show it and he would. If anything that shows his client's innocence, he would do that. And he did put on a witness.

* * *

Now, we hear about Larry Shriner. Of course, we didn't hear any testimony about Larry Shriner's news reports. We didn't hear any testimony by Larry Shriner himself on the stand. I mean, if Larry Shriner, and they have the name, knows about the fired bullet, he would have been on that stand. Oh, I already knows [sic] about the bullet. I reported.

* * *

Last but not least, and we heard him ask, where is Sergeant Dornbos? Why didn't they present Sergeant Dornbos? Well, we presented Ronald Russell and a host of other witnesses. The defense chose to call Ronald Russell. We don't believe obviously that Sergeant Dornbos had anything to add to this. You heard from the witnesses. You heard from Joe Rinaldi himself. That is who talked to Sergeant Dornbos, so you also heard testimony from that stand read to you again by Mr. Lynch here not long ago, not that long ago, that Joseph Rinaldi said Sergeant Dornbos offered him three years. Sergeant Dornbos told him he would be married that night to a big black person. You know, if Sergeant Dornbos said all those things, they had a subpoena, bring him in. Tell him. Let him tell you that.”

Defendant contends that the prosecutor committed reversible error when he repeatedly told the jury that the defense also had subpoena power and could have subpoenaed Rinaldi's bank records, Dornbos and Shriner. Defendant claims that the prosecutor's remarks improperly sent a message to the jury that they should place blame upon the defense for having failed to meet their burden of presenting this evidence and these witnesses. According to defendant, the prosecutor's comments resulted in shifting the burden of proof to defendant.

After examining the prosecutor's comments in the context of the proceedings, we find that such comments were not improper because they were based on reasonable inferences drawn from the evidence or invited by the closing arguments of defense counsel. Moreover, we note that the trial court instructed the jury that the State has the burden of proving defendant guilty beyond a reasonable doubt and that defendant is not required to prove his innocence. This instruction made it clear to the jury that the prosecutor could not shift the burden of proof to defendant.

During trial, Rinaldi testified that he initially paid defendant and Permanian several cash installment payments to avoid detection by the police. On cross-examination, Rinaldi indicated that he made these payments either out of his employment check or his bank account but that the bank records would not reflect a set amount. Defense counsel cross-examined Rinaldi about his inability to show bank records of withdrawals to corroborate his testimony regarding the installments payments. Defense counsel, on cross-examination, further elicited from Rinaldi that the State never inquired about the bank records. The implication by defense counsel was that the bank records would belie Rinaldi's claims regarding the installment payments and therefore represented the reason that the State did not produce those records. During closing arguments, the prosecutor merely responded to the inference set forth by defense counsel during trial. By referring to defendant's ability to subpoena those records, the prosecutor merely commented on the value of such records, which is a reasonable inference drawn from the evidence given Rinaldi's testimony that the records did not reflect the actual payments. As noted, an attorney's statements that are based on reasonable inferences drawn from the evidence are within the scope of proper argument. See 
Edgeston
, 157 Ill. 2d at 219; 
Peeples
, 155 Ill. 2d at 485-86.

The prosecutor's remarks in rebuttal regarding defendant's ability to call Dornbos and Shriner can be construed as a response to statements made by defense counsel in closing argument. We have held that the prosecutor may respond to comments by defense counsel which clearly invite a response (see 
Kitchen
, 159 Ill. 2d at 39), and that comments made in closing argument must be considered in the proper context by examining the entire closing arguments of both the State and the defendant (see 
Cloutier
, 156 Ill. 2d at 507; 
Kitchen
, 159 Ill. 2d at 38). In closing argument, defense counsel reminded the jury that Dornbos was the lead investigator in this case, and that Dornbos had interrogated Rinaldi. Defense counsel then suggested that the jury consider why, if Dornbos had not made promises or threats to Rinaldi upon Rinaldi's arrest, as Rinaldi had originally testified at the suppression hearing, the prosecution had not called Dornbos to testify to that fact. In response to defense counsel's argument, the prosecutor pointed out on rebuttal that defendant could have called Dornbos as a witness. In so responding, the prosecutor did not shift the burden of proof to defendant. See 
People v. Redd
, 173 Ill. 2d 1, 31 (1996) (holding that the burden of proof was not shifted when the prosecutor, in closing argument, referred to the defendant's right to “ `subpoena each and every witness he may want to and put anybody at all on the witness stand' ”); 
People v. Brown
, 172 Ill. 2d 1, 42 (1996) (holding that the jury would not interpret the prosecutor's comment as shifting the burden of proof to the defendant where the prosecutor argued that “ `[i]f there was anybody in the world that could describe the relationship ***, you can be sure the defense would have had the people up on the stand' ”). In fact, the prosecutor acknowledged that the burden of proof was on the State. Moreover, we find that the prosecutor's comments during rebuttal argument regarding defense counsel's ability to subpoena Dornbos were invited by defense counsel's argument that the State failed to call him as a witness. See 
People v. Mahaffey
, 128 Ill. 2d 388, 423-25 (1989).

We likewise find that the prosecutor did not shift the burden of proof to defendant with respect to the comments about Shriner. In closing argument, defense counsel argued that, although police claimed that evidence was not released to the media, newsman Shriner knew about evidence in the case regarding a bullet and shell casings found on the ground on the night of the murder. Defense counsel suggested that the jury consider the State's failure to present testimony about alleged facts reported to the news media. Defense counsel sought to imply that the State's witnesses gleaned information about the case from media reports and not firsthand knowledge. In rebuttal, the prosecutor remarked about Shriner's lack of testimony at trial in response to defense counsel's arguments regarding the State's failure to call Shriner as a witness. This court has held that where the challenged remarks were invited, a defendant cannot assign them as error on appeal. See 
Brown
, 172 Ill. 2d at 43.

Defendant next claims that the prosecutor, in rebuttal argument, improperly commented on defendant's failure to testify at trial. In rebuttal argument, the prosecutor informed the jury:

“The only witnesses who were brought in in rebuttal to say these people said something different to me were the witnesses brought in from Tyrone Miller and that wasn't even to say he said something different, just to say he couldn't have seen what he saw[;] and Ronald Russell. When Joe Rinaldi finished testifying, his testimony stands unrebutted.”

Defendant contends that the prosecutor's reference to the “only witness” called by the defense and Rinaldi's testimony being “unrebutted” reminded the jury that defendant had not testified. 

A criminal defendant has a constitutional right not to testify as a witness in his own behalf. See 
People v. Howard
, 147 Ill. 2d 103, 146 (1991); 
People v. Herrett
, 137 Ill. 2d 195, 210 (1990). As a result, the prosecutor is prohibited from directly or indirectly commenting on the defendant's failure to take the stand in his own defense. See 
Howard
, 147 Ill. 2d at 146; 
Herrett
, 137 Ill. 2d at 210-11. This court, however, has held that the prosecutor can describe the State's evidence as uncontradicted provided that the comments are not intended or calculated to direct the jury's attention to the defendant's failure to testify. See 
Howard
, 147 Ill. 2d at 147;
 Herrett
, 137 Ill. 2d at 211. In determining whether the challenged remarks were improper comments on the defendant's failure to testify, a reviewing court must examine the remarks in the context of the entire proceedings. See 
Howard
, 147 Ill. 2d at 147; 
Herrett
, 137 Ill. 2d at 211. Moreover, an error resulting from a comment on the defendant's failure to testify does not require reversal where the reviewing court is able to conclude upon an examination of the entire record that the error was harmless beyond a reasonable doubt. See 
Howard
, 147 Ill. 2d at 147-48.

We find that the prosecutor's comments in rebuttal were not intended or calculated to direct the jury's attention to defendant's failure to testify. The prosecutor responded to defense counsel's closing argument, which challenged the State's evidence against defendant, by summarizing the evidence presented by the defense. The prosecutor noted that the defense witnesses consisted of those who contradicted Tyrone Miller regarding Miller's ability to see someone in the parking lot on the night of the murder, and Ronald Russell, who attempted to impeach the testimony of Paul Skorupa regarding whether he saw the victim's car on the night of the murder. In particular, the comments referring to the “only” witnesses and Rinaldi's testimony being “unrebutted” were merely designed to characterize the evidence against defendant. These comments did not necessarily direct the jury's attention to defendant's failure to testify, and therefore were not improper. See 
Herrett
, 137 Ill. 2d at 211 (finding that the prosecutor's comments referred to omissions in testimony that could have been supplied by witnesses other than the defendant); 
cf
. 
Howard
, 147 Ill. 2d at 147 (determining impermissible comment on the defendant's failure to testify where the prosecutor referred to the absence of any testimony to contradict the statements appearing in the defendant's confessions and the only witness who would have presented such evidence was the defendant). Nevertheless, even if error occurred, the challenged comments did not deprive defendant of a fair trial. Defendant's rights were sufficiently safeguarded when the trial judge, at the close of the evidence, instructed the jurors that defendant's decision not to testify should not be considered by them in rendering a verdict. In light of the context of the proceeding, we conclude that the prosecutor's comments were not improper or did not deprive defendant of a fair trial. See 
People v. Moore
, 171 Ill. 2d 74, 105-07 (1996).

As a final matter regarding closing arguments, defendant contends that the prosecutor committed reversible error when he informed defendant's jury about damaging testimony which had been heard only by codefendant Permanian's jury. During closing arguments, the prosecutor made the following statements regarding Tammy Behenna:

“Yes, she cooperated with police, wearing a wire. Trying to get information from Permanian as well. You heard about that. It seems Permanian had begun to catch on and pats her down looking for the wire.

[Defense Counsel]: We are going to object and make a motion.

THE COURT: I think you can disregard that last statement, ladies and gentlemen. Go ahead and proceed ***.

[Assistant State's Attorney]: There was evidence from Ms. Behenna that he did pat her down.

[Defense Counsel]: Judge, we are going to make a–I'll make a motion later. I'm objecting.

THE COURT: Ladies and gentlemen, once again, anything not supported by the evidence should be disregarded by you.”

Defendant claims that the testimony about Permanian's frisking Behenna for a wire had been heard only by the Permanian jury. According to defendant, this argument was improper because it was not based upon any evidence in defendant's case. Defendant also contends that such comments were prejudicial to him because they suggested defendant's guilt through testimony that primarily implicated Permanian.

We agree with defendant that is was improper for the prosecutor to refer to Permanian's frisking of Behenna. Most of the evidence concerning the listening device worn by Behenna was introduced by defense counsel, who, during Behenna's cross-

examination, elicited the information that the police had provided her with a recording device on two separate occasions when she met with Permanian. Behenna indicated that she only wore the recording device with Permanian and not with defendant. This evidence was apparently brought out on Behenna's cross-

examination to implicate Permanian. Consequently, any comments about Behenna wearing a listening device were fair comments on the evidence and defendant cannot now complain about prosecutorial comments relating to evidence which defense counsel elicited. Nevertheless, prosecutorial comments about Permanian's pat down of Behenna in search of a wire were not based on evidence from defendant's case and therefore were improper. Despite the improper comments by the prosecutor, no substantial prejudice accrued to defendant. See 
People v. Henderson
, 142 Ill. 2d 258, 323-26 (1990) (finding prosecutorial comments improper where there was no evidence at trial to support the comments but not reversible error given the objection and the instruction to the jury). The trial judge immediately instructed the jury to disregard the prosecutor's comments, and later instructed the jury that closing arguments are not evidence and to disregard any arguments not based on the evidence. Such instructions can serve to alleviate any possible prejudice from an erroneous closing comment by the State. See 
People v. Hope
, 168 Ill. 2d 1, 26 (1995); 
cf
. 
People v. Sullivan
, 72 Ill. 2d 36, 43-44 (1978) (the defendant was deprived of a fair trial where the prosecutor urged the jury to gauge the defendant's guilt by referring to his alleged accomplices' guilty pleas to the same offense and the trial court did not instruct the jury to disregard it). Therefore, the prosecutor's improper reference to evidence introduced at Permanian's trial was not so substantial that it prejudiced defendant and deprived him of a fair trial.

In light of the foregoing reasons, we hold that the challenged prosecutorial comments during closing and rebuttal arguments did not operate to deny defendant a fair trial or due process of law. See 
Donnelly v. De Christoforo
, 416 U.S. 637, 645, 40 L. Ed. 2d 431, 438, 94 S. Ct. 1868, 1872 (1974) (prosecutor's remark has not made the defendant's trial “so fundamentally unfair as to deny him due process”).

H
. Ex Parte Communications

Defendant argues that the trial judge engaged in improper 
ex parte 
communications with the jury when it responded to the jury's inquiries without notifying or consulting with defense counsel or defendant about the jury's requests and the appropriate responses. Defendant insists that he was prejudiced by the 
ex parte
 communications such that the trial court's actions amounted to reversible error.

The record reveals that the jury deliberated from February 26, 1996, to February 28, 1996. During the course of those deliberations, the jury sent six written notes to the judge. The jury's first written request to the court stated: “We need transcript of trial. Opening statements. Ranialdi [
sic
] testimony.” In response, the court wrote “no” on the bottom of the note. A second note from the jury asked: “When were these pictures taken. What were dates taken of People's exhibit 56, 57, 58, 60.”
(footnote: 1) In response, the court wrote “Feb. 1988” on the note. Below that response was written, “We disagree,” with lines drawn through those words. In its next note, the jury announced, “We are done for today!” The judge did not respond to the communication. In its fourth note, the jury informed the court that: “Someone wishes to walk around block escorted is this okay? One person needs to get fresh air and clear their head. Thanks.” In response, the court wrote, “No, sorry.” In the fifth note, the jury wrote, “We are done for today!” The judge wrote, “Transportation is coming at 6:00 p.m. Continue to deliberate.” In their final note, the jury complained about poor hotel and food accommodations and asked, “Can any of this be fixed should we need to stay longer?” Seven of the jurors signed their names. No response from the judge was indicated on this note.

The State initially responds that defendant's argument regarding the jury notes is waived. The State points out that defense counsel neither made an objection at the time of the alleged error nor stated this reason as grounds for error in his post-

trial motions. It is well settled that both an objection at trial and a written post-trial motion raising the issue are necessary to preserve an alleged error for review. See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Nonetheless, we have determined that application of the waiver rule is less rigid where the basis for the objection is the trial judge's conduct. See 
People v. Williams
, 173 Ill. 2d 48, 85 (1996). We therefore address defendant's claim of alleged judicial impropriety.

In examining communications between a jury and a trial court, this court has established certain principles. A criminal defendant has a constitutional right to appear and participate in person and by counsel at all proceedings involving his substantial rights. See 
McDonald
, 168 Ill. 2d at 459; 
People v. Childs
, 159 Ill. 2d 217, 227 (1994). A communication between the judge and the jury following the jury's retiring to deliberate, except one held in open court and in the defendant's presence, deprives the defendant of his constitutional rights. See 
McDonald
, 168 Ill. 2d at 459; 
Childs
, 159 Ill. 2d at 227. A jury verdict, however, will not be set aside where it is apparent that no harm or prejudice resulted from an 
ex parte
 communication. See 
McDonald
, 168 Ill. 2d at 460; 
Childs
, 159 Ill. 2d at 227-28. The State has the burden of proving that any error in the 
ex parte
 response is harmless beyond a reasonable doubt. See 
McDonald
, 168 Ill. 2d at 460; 
Childs
, 159 Ill. 2d at 228.

In this case, an 
ex parte 
communication did in fact occur between the trial judge and the jury. There is no indication in the record that the trial judge notified either defense counsel or defendant of the jury's six written inquiries. There is also no indication in the record that the trial judge conferred with defense counsel or defendant before answering the jury's inquiries or choosing not to reply. Instead, the trial judge communicated with the jury outside of defendant's presence during jury deliberations, which are a critical stage of trial affecting defendant's substantial rights. Consequently, the trial judge conducted an 
ex parte
 communication with the jury. See 
McDonald
, 168 Ill. 2d at 459-

60.

Having determined that improper 
ex parte 
communications occurred, we next examine whether defendant suffered prejudice as a result. Defendant contends that he was harmed by the trial court's 
ex parte
 communications because he was denied an opportunity to suggest to the trial judge appropriate responses to the jury's notes. We disagree.

The general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. See 
Childs
, 159 Ill. 2d at 228-

29. A trial court, however, may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law; where further instructions would serve no useful purpose or would potentially mislead the jury; where the jury's inquiry involves a question of fact; or if providing an answer would cause the court to express an opinion which would likely direct a verdict one way or another. See 
Childs
, 159 Ill. 2d at 228. This court has found there to be prejudicial error where the trial court engaged in an 
ex parte
 communication and failed to answer a question of law. See 
Childs
, 159 Ill. 2d at 233-35 (where the trial court engaged in an 
ex parte
 communication that resulted in prejudice to the defendant when the jury expressed confusion on a question of law regarding the jury instructions and the trial judge referred the jury back to the original instruction).

As to the jury's first written inquiry, which requested transcripts of the opening statements and Rinaldi's testimony, the trial court had discretion to determine whether it would make the transcripts available. The decision whether to grant or deny a jury's request for transcripts of testimony rests within the sound discretion of the trial court and, unless there is an abuse of that discretion, the trial court's determination will not be disturbed on review. See 
Williams
, 173 Ill. 2d at 87. Initially, we note that the trial judge's response of “no” does not indicate that the denial of the transcripts was based upon the trial judge's mistaken belief that she had no discretion to provide the transcripts. 
Cf.
 
People v. Queen
, 56 Ill. 2d 560, 565 (1974) (trial judge stated that he could not have testimony of witnesses read to the jury and his reply was found to indicate that he erroneously believed he had no discretion to give the jury the transcript). In fact, there is no indication in the record that the trial judge abused her discretion in denying the jury's request. See 
Williams
, 173 Ill. 2d at 86-88. Because the jury's request with respect to the transcripts did not involve a legal issue, the trial court properly exercised its discretion and declined to provide the transcripts. Moreover, defendant was not prejudiced by the trial court's failure to provide the requested transcripts because the jury could not have considered the opening statements as evidence and the jury already had heard sworn testimony by Rinaldi, who had implicated defendant in the murder.

Defendant was also not prejudiced by the trial court's response to the jury's second note concerning the date of certain photographs. The trial court's response of February 1988 was factually consistent with the evidence presented at trial. This response did not “stamp” the State's position with the trial judge's approval, as advanced by defendant. We also reject defendant's additional claim that he was prejudiced by the trial court's response because some jurors disagreed with that response as indicated by the statement “we disagree” at the bottom of the note. This allegation is speculative and is not supported because the phrase “we disagree” has lines drawn through it.

Defendant's challenges to the court's responses or failure to respond to the remaining four notes are also without merit. Defendant argues that he was prejudiced because the trial judge may have acted in such a manner as to coerce a verdict. We find that these remaining notes did not provide information that was relevant to the issue of the jury's willingness to continue deliberating. In the third and sixth notes in which the jury announced respectively “we are done for today” and complained about their hotel and food accommodations, the court properly declined to respond to these notes because further instruction would serve no useful purpose. When informing the court that it was done for the day, the jury did not ask a question but merely informed the court of the status of its deliberations. Moreover, there is no indication that the jury's verdicts were hastened by the trial court's failure to respond to the complaints of poor accommodations. The note regarding the poor accommodations was written on February 27; however, the verdict was not reached until the following day. The length of time following the complaints and the rendering of the verdicts belies defendant's claim that he was prejudiced by the trial judge's failure to respond. We likewise find no prejudice to defendant in the trial court's refusal to grant a juror's request to take a walk around the block. This request was also made on February 27, and the verdicts were not reached until the next day. Finally, we find that the trial judge's statement to the jury to continue deliberating until transportation arrived at 6 p.m. was an appropriate response to the jury's announcement that it was done for the day. This response conveyed neutral information and did not imply any pressure to reach a verdict, which as noted was not rendered until the next day. Defendant therefore suffered no prejudice from the trial court's providing the jury with this information. See 
People v. Steidl
, 142 Ill. 2d 204, 230-32 (1991) (where defendant was not prejudiced because the trial court told the jurors about the time and arrangements for their sequestration, including transportation). After considering all of the aforementioned notes, we find that the manner in which the trial court dealt with the jury's inquiries was not a factor in the jury's rendering of the verdicts of guilty against defendant.

Accordingly, we hold that the 
ex parte
 communications did not prejudice defendant, and as a result, such improper communications were harmless beyond a reasonable doubt. Defendant therefore is not entitled to a new trial.

I. 
Jury Polling

Defendant challenges the manner in which the trial judge polled the jury. On February 28, 1996, the jury returned verdicts finding defendant guilty of first degree murder and conspiracy. Following the reading of the verdict, the jury was polled at the request of defendant. Each juror was asked, “Was this and is this now your verdict?” Each of the jurors responded “yes” to the question. Defendant now alleges that the trial judge failed to poll juror Reed Larson and mistakenly polled venireperson Bruce Kamp, who had been removed by a peremptory challenge prior to trial, juror William Peterson, who had been removed and replaced by alternate juror Lawrence Melvin before opening statements, and alternate juror Philip Buettner, who was discharged by the court at the end of the trial on February 26, 1996. Defendant claims that the trial court's polling of the jury indicated that nonjurors were improperly part of the deliberative process such that a question arises about the unanimity of the guilty verdicts entered against defendant.

The State points out that this issue is waived because defendant failed to object at the time the jury was polled and failed to raise this issue in his post-trial motions. As noted above, application of the waiver rule is less rigid where the basis for the objection is the trial judge's conduct. For this reason, we address defendant's claim regarding the polling of the jury.

The purpose of polling a jury is to determine that the verdict accurately reflects each juror's vote and that the vote was not the result of coercion. See 
McDonald
, 168 Ill. 2d at 462; 
People v. Kellogg
, 77 Ill. 2d 524, 528 (1979). When polling a jury, if a juror indicates some hesitancy or ambivalence in his or her answer, then the trial judge must determine the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to the juror's present state of mind. See 
McDonald
, 168 Ill. 2d at 463. A trial court's determination as to the voluntariness of the juror's assent to the verdict will not be set aside unless that determination is clearly unreasonable. See 
McDonald
, 168 Ill. 2d at 463.

Defendant's argument in this case is not based on the jurors' answers during polling. Rather, defendant questions the accuracy of the polling itself. We find that defendant's argument is based on typographical errors made by the court reporter when she transcribed the proceedings dated February 28, 1996, which included the polling of the jury. According to the original transcript of proceedings, Kamp, Peterson and Buettner orally assented to the verdict, and there was no questioning of Larson. This court, however, allowed the State's motion to supplement the record on appeal with a corrected transcript of the February 28, 1996, proceedings, which was prepared after the court reporter consulted her stenographic notes. The corrected transcript of the proceedings reveals that juror Larson was properly polled and assented to the verdict, whereas Kamp, Peterson and Buettner did not in fact participate in the poll. Consequently, the corrected transcript shows that all 12 jurors who actually served on the jury and signed the verdict forms confirmed their agreement with the verdicts.

We further note that other portions of the record corroborate the corrected transcript. The juror daily attendance sheet dated February 28, 1996, the date on which the poll was conducted, provides the names of the jurors who reported for service that day. This sheet shows that Larson was present, as indicated by his signature next to his name, and that Kamp, Peterson and Buettner were not present for that day. Kamp's name is not even listed and there is no signature next to the names of Peterson and Buettner. Instead, lines were drawn through the names of Peterson and Buettner because the court had earlier excused them from the jury. Even more revealing than the juror attendance sheet are the actual verdict forms signed by the jurors. Both guilty verdicts were signed by the 12 jurors, including Larson. Moreover, they do not contain any signatures by Kamp, Peterson or Buettner. Under these circumstances, defendant cannot demonstrate that Larson did not participate in the deliberations or that Kamp, Peterson or Buettner did participate. 
Cf
. 
People v. Babbington
, 286 Ill. App. 3d 724, 735 (1997) (reversing convictions and remanding the cause for a new trial because an alternate juror dismissed at the end of the trial indisputably signed the verdict forms, deliberated with the jury, and responded when polled). It is therefore evident that defendant's claim is contradicted by the record.

As a final matter, we reject defendant's alternative argument that we remand to the trial court for an evidentiary hearing pursuant to Supreme Court Rule 329 (134 Ill. 2d R. 329) so as to address the conflict between the two versions of the transcript. This court already granted the State's motion to supplement the record on appeal with the corrected transcript. In granting this motion, this court considered the arguments of the parties and the affidavit of the court reporter attesting to the errors in the original transcript of the proceedings and the accuracy of the corrected transcript. There is no evidence presented to question the accuracy of the corrected transcript, particularly in light of the fact that defense counsel did not object at the time the jury was polled.

Thus, defendant's claim is insufficient to warrant granting a new trial or remanding for an evidentiary hearing.

III. Sentencing Issues

A. 
Recusal of Sentencing Judge

Prior to the commencement of the eligibility phase of the death penalty hearing, defendant filed a motion for an 
in camera
 hearing. The motion sought to obtain information regarding whether 
ex parte
 communications from the sheriff's department had been made to the trial judge regarding threats to the trial judge by defendant and whether such information had prompted the trial judge to order additional security for herself, including having someone start her car. The motion further stated defendant's concern that such 
ex parte
 contacts reflected adversely on defendant at the sentencing hearing. The motion concluded that the trial court erred in not timely notifying defendant about the additional security arrangements and therefore requested an 
in camera
 hearing to address this matter. After hearing arguments by defense counsel regarding this motion, the trial court denied any improper 
ex parte
 contacts, and refused defendant's request for an 
in camera
 hearing. Defendant now argues that, under these circumstances, the trial judge erred in failing to recuse herself from the sentencing hearing or, at a minimum, from the hearing on defendant's motion.

Initially, we note that the trial judge is in the best position to determine whether he or she is prejudiced against the defendant. See 
People v. Evans
, 125 Ill. 2d 50, 80 (1988). The trial judge's decision will not be reversed absent an abuse of discretion. See 
People v. Wilson
, 37 Ill. 2d 617, 621 (1967). After considering the record, we find that the trial judge did not abuse her discretion in not recusing herself from either considering the motion or presiding over the sentencing hearing. A judge should disqualify himself or herself where the judge's impartiality might reasonably be questioned, including instances where the judge has personal knowledge of disputed evidentiary facts concerning the proceeding. See 155 Ill. 2d R. 63(C)(1)(a). In this case, there is no basis for questioning the trial judge's impartiality and no indication of prejudice against defendant. The record contains no evidence of any 
ex parte
 communications concerning the merits of this case. The trial judge denied any improper contacts with anyone from the sheriff's department regarding threats by defendant and the need for additional security. Rather, the trial judge indicated that additional security was routinely ordered in capital cases. Moreover, when sentencing defendant, the trial judge neither referred to any alleged threats made by defendant against the court nor gave any indication that such threats influenced her sentencing decision or impeded her ability to give defendant a fair trial.

Parenthetically, we note that a trial judge has the duty to protect the safety of individuals in the courtroom by ordering additional security measures when necessary. In 
People v. Ashford
, 168 Ill. 2d 494 (1995), the defendant argued that the sentencing judge had improperly considered an 
ex parte
 memorandum from the sheriff's department. The memorandum recommended additional security procedures at the sentencing hearing because defendant was prone to violent outbursts and planned to disrupt the courtroom following sentencing. This court held that there was no evidence that the sentencing judge improperly considered the memorandum for sentencing purposes, after noting that the sentencing judge did not refer to the memorandum or indicate that it influenced his sentencing decision. See 
Ashford
, 168 Ill. 2d at 508. We likewise find that the trial judge here merely instituted additional security measures, and did not engage in conduct that might result in questioning the judge's impartiality. We therefore reject defendant's claim as unsupported by the record.

B. 
Evidence in Aggravation and Closing Arguments

Defendant raises several challenges to evidence introduced or excluded at the second phase of the capital sentencing hearing. Defendant also challenges the trial court's rulings regarding closing arguments.

Defendant first challenges the admission of certain evidence presented by the State in aggravation. More specifically, defendant refers to testimony by Officer Richard Stuebe regarding information he received from university officials and students concerning prior criminal conduct by defendant while attending Northeastern Illinois University, including charges of assault and complaints involving defendant's threats to others; testimony by Officer Frank Bresnahan regarding a threatening phone call allegedly made by defendant from Cook County jail to Steven Smith in Ontario, Canada, on January 28, 1995; and the admission of defendant's Chicago police department “rap sheet,” which indicated defendant's prior arrests. Defendant argues that such evidence was unreliable because the testimony by Officers Stuebe and Bresnahan amounted to uncorroborated hearsay and the prior arrests noted in the “rap sheet” did not result in convictions. Defendant maintains that the trial court abused its discretion in admitting this evidence. Defendant therefore requests a new sentencing hearing.

At the second phase of the death penalty hearing, evidentiary rules are relaxed because it is important that the sentencing authority have before it the fullest information possible regarding the defendant's life, character, criminal record and the circumstances of the particular offense. See 
People v. Johnson
, 128 Ill. 2d 253, 283-84 (1989). It is well settled that the standard for admissibility of evidence proffered during the aggravation and mitigation phase of a capital sentencing hearing is that the evidence be relevant and reliable, the determination of which lies within the sound discretion of the trial judge. See 
People v. Foster
, 119 Ill. 2d 69, 96 (1987); 
People v. Eddmonds
, 101 Ill. 2d 44, 65 (1984). Hearsay evidence of crimes that did not result in prosecution or conviction is admissible at the second phase of the death sentencing hearing provided it meets the requirements of relevancy and reliability. See 
People v. Williams
, 181 Ill. 2d 297, 331 (1998); 
People v. Moore
, 171 Ill. 2d 74, 111 (1996); 
People v. Hudson
, 157 Ill. 2d 401, 450 (1993). Moreover, evidence relating to a defendant's past criminal conduct, including a “rap sheet,” is relevant to the sentencing phase because it provides an insight into the defendant's character. See 
People v. Richardson
, 123 Ill. 2d 322, 361-62 (1988); 
People v. Lego
, 116 Ill. 2d 323, 346-47 (1987).

In this case, defendant argues that the aforementioned evidence is unreliable because it was not corroborated at his death penalty proceeding. In addressing defendant's claim, we note that, where the trial court alone conducts the sentencing hearing, the trial court is presumed to have considered only properly admitted evidence in determining the sentence. See 
People v. Cortes
, 181 Ill. 2d 249, 291 (1998); 
People v. Johnson
, 119 Ill. 2d 119, 149 (1987); 
Eddmonds
, 101 Ill. 2d at 65-66. There is nothing in this record to rebut that presumption. We observe that the trial court, in stating its findings, made it clear that it was not relying on all of the evidence offered by the State in aggravation. In fact, the trial judge specifically announced that she had rejected any evidence she did not find to be sufficiently reliable. The trial judge stated: “I would like to state that I have had to sort through some of this evidence. Some of the State's evidence was not necessarily reliable or reliable enough, and the Court has not considered that evidence in sentencing here today.” Additionally, the record indicates that the trial judge did not cite to any of the evidence here challenged by defendant in announcing the factors she considered in aggravation. Consequently, defendant was not prejudiced by the admission of such evidence. See 
Cortes
, 181 Ill. 2d at 291; 
People v. Erickson
, 117 Ill. 2d 271, 300 (1987); 
Eddmonds
, 101 Ill. 2d at 66. Therefore, the trial court's admission of the preceding evidence, even if erroneous, did not deprive defendant of a fair sentencing hearing.

Defendant also contends that the trial court erred in refusing to allow the defense to impeach a State witness who gave evidence in aggravation at the sentencing hearing. The defense attempted to attack the credibility of John Apel, Sr., by inquiring of Alvin Goldstein, who was defendant's step-father and Apel's brother-in-

law, about Apel's reputation for truthfulness. The trial court sustained the State's objection. Defendant claims that the trial court erred in its ruling because Goldstein would have testified about Apel's poor reputation for truth and veracity. Defendant therefore seeks a new sentencing hearing.

It is well established that a witness in a criminal case may be impeached by proof of reputation for untruthfulness. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §608.2 (6th ed. 1994). The proper procedure to introduce evidence of truthfulness is to ask the impeaching witness whether he knows the general reputation of the principal witness' truthfulness in the neighborhood in which he lives or amongst those with whom he works or socializes. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §608.3 (6th ed. 1994). The testimony must relate to the witness' reputation at the time of trial. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §608.3 (6th ed. 1994). As noted above, evidentiary determinations at a capital sentencing hearing are examined under an abuse of discretion standard. See 
Eddmonds
, 101 Ill. 2d at 65.

With these principles in mind, we examine defense counsel's attempted impeachment of Apel. The record shows that defense counsel did not ask Goldstein for Apel's reputation in the neighborhood in which he now lived or among those with whom he worked or socialized. Moreover, Goldstein could not report Apel's reputation at the time of trial because Goldstein indicated that he had not seen much of Apel after 1990, which is six years prior to the trial. Accordingly, under these circumstances, the trial court did not abuse its discretion in refusing this evidence.

In addition to evidentiary errors, defendant claims that he is entitled to a new sentencing hearing because of the trial court's rulings regarding closing arguments. In closing argument, the prosecutor argued:

“It's clear from the record of this man and everything that he has done that as long as he is alive even in a jail cell, the lives of others are going to be in constant danger. And there is only one way to protect the lives of others from this individual, and that's by putting an end to his life.”

Defendant claims that this argument was improper because it suggested defendant's future dangerousness should a death sentence not be imposed, and thereby improperly influenced the decision to impose the death penalty in this case. We note that the possibility of committing future crimes is irrelevant to the consideration of aggravating and mitigating factors. See 
Edgeston
, 157 Ill. 2d at 241. Nevertheless, when the trial judge is the sentencer, it is presumed that the trial judge based his decision upon competent and reliable evidence, which does not include arguments of counsel. See 
People v. Johnson
, 149 Ill. 2d 118, 154 (1992); 
Evans
, 125 Ill. 2d at 95. It is also presumed that the trial judge ignored irrelevant, inflammatory or emotional factors in determining the sentence. See 
Johnson
, 149 Ill. 2d at 154. There is no evidence in this record that shows the trial judge here made a decision on the basis of these remarks by the prosecutor. See 
Johnson
, 149 Ill. 2d at 154-56. Consequently, there is no reasonable possibility that the prosecutor's remarks improperly influenced the sentencing decision of the judge. Therefore, we find that defendant was not denied a fair sentencing hearing.

Defendant also contends that the trial court erred in refusing to overrule the prosecutor's objection to defense counsel's reference in closing argument to residual doubt as a mitigating factor. We disagree. This court has previously held that residual doubt is not relevant to the imposition of the death penalty because it is not relevant to the circumstances of the offense or the defendant's character. See 
McDonald
, 168 Ill. 2d at 456; 
Edgeston
, 157 Ill. 2d at 244-45. We find no reason to depart from this court's prior decisions.

We therefore reject defendant's claims of error during the second stage of the death penalty hearing and find no basis warranting the granting of a new sentencing hearing.

C. 
Disparate Sentences

Defendant contends that his death sentence is unreasonably disparate from the 60-year term of imprisonment imposed on Joseph Rinaldi. In support, defendant claims that he and Rinaldi are equally culpable because Rinaldi planned the murder of his wife and hired others to commit it. Defendant further claims that his character and background do not support the disparity between the sentences. Defendant requests that because there is no basis for the disparate sentences, his sentence of death be vacated and the cause remanded for resentencing.

In reviewing a death sentence disparity claim, we have compared a defendant's death sentence to the sentence imposed upon a codefendant. See 
People v. Towns
, 174 Ill. 2d 453, 479 (1996); 
People v. Burt
, 168 Ill. 2d 49, 80 (1995); 
People v. Bean
, 137 Ill. 2d 65, 134 (1990); 
People v. Ashford
, 121 Ill. 2d 55, 82-90 (1988). This court's decisions have focused on such factors as the nature of the offense, each defendant's relative involvement or culpability, his character and background, including any criminal record, and his potential for rehabilitation. See 
People v. Griffin
, 178 Ill. 2d 65, 89 (1997); 
Towns
, 174 Ill. 2d at 479; 
Burt
, 168 Ill. 2d at 80; 
Bean
, 137 Ill. 2d at 134. This court has held that similarly situated codefendants should not be given arbitrarily or unreasonably disparate sentences. See 
Burt
, 168 Ill. 2d at 80; 
People v. Jackson
, 145 Ill. 2d 43, 119 (1991).

With these principles in mind, we find that defendant's death sentence is not unreasonably disparate to Rinaldi's 60-year sentence. Defendant's claims do not support a conclusion that he and Rinaldi were equally culpable in the commission of Dana Rinaldi's murder. The evidence shows that defendant and Rinaldi did not have equal roles in the actual murder of Dana. Rather, defendant was the one who repeatedly shot Dana in cold-blood. Defendant had the final opportunity to preserve Dana's life when his gun jammed. Nevertheless, defendant chose to fire the fatal shot. Although we do not minimize the role Rinaldi played in hiring defendant, we find that under the circumstances, defendant's conduct is more culpable. See 
Griffin
, 178 Ill. 2d at 90; 
People v. St. Pierre
, 146 Ill. 2d 494, 513-14 (1992); 
Bean
, 137 Ill. 2d at 135; 
Ashford
, 121 Ill. 2d at 88-89.

We further find that the evidence shows that defendant and Rinaldi are not similarly situated with respect to their character and background. To aid our review in this matter, the record has been supplemented with transcripts of the sentencing hearing following Rinaldi's plea of guilty. Members of Rinaldi's family testified about his good character. There was no evidence presented that Rinaldi had a prior criminal record. There was also testimony that Rinaldi's behavior in jail was exemplary and that he was considered an outstanding inmate. Moreover, Rinaldi expressed his sorrow and remorse at the sentencing hearing. After considering the evidence, the trial judge found Rinaldi to be remorseful and capable of being rehabilitated.

Defendant's character and background differ significantly from that of Rinaldi. The evidence presented at defendant's trial and sentencing hearing showed that defendant had been involved in a number of burglaries, fire-bombings of homes of people with whom he had minor disagreements, and traffic altercations in which he displayed a gun. There was also evidence that defendant had hired someone to murder his uncle and girlfriend while he was incarcerated. Moreover, defendant exhibited no remorse for his role in Dana's murder, as evidenced by his bragging and laughing about that murder. Finally, defendant adjusted poorly to incarceration, as indicated by his possession of weapons and threats to others while in prison. The aforementioned evidence shows that defendant's criminal history is more extensive and his prospects for rehabilitation significantly poorer than Rinaldi. Comparing the character and background of defendant and Rinaldi provides an additional basis for the sentence disparity between them.

We therefore conclude that a more severe sentence for defendant was justified and proper given the circumstances of this murder and defendant's character and background.

IV. Constitutionality of the Illinois Death Penalty Statute

As a final matter, defendant challenges the constitutionality of the Illinois death penalty statute. Defendant contends that the statute is unconstitutional because it places a burden of proof on the defendant that precludes meaningful consideration of mitigating evidence, allows the sentencer to weigh a vague aggravating factor, and fails to minimize sufficiently the risk of arbitrarily or capriciously imposed death sentences. This court has previously considered and rejected these claims. See, 
e.g.
, 
People v. Gilliam
, 172 Ill. 2d 484, 522-23 (1996); 
People v. Taylor
, 166 Ill. 2d 414, 439-40 (1995); 
Edgeston
, 157 Ill. 2d at 247. Defendant offers no compelling reason why this court should reconsider its prior decisions. We therefore adhere to those decisions upholding the constitutionality of the Illinois death penalty statute and reject defendant's claims.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Thursday, March 18, 1999, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed
.

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Ronald Kliner's conviction should be upheld. For the reasons set forth in my dissent in 
People v. Bull
, No. 81578 (November 10, 1998), however, this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Accordingly, we should vacate Kliner's death sentence and remand the cause to the circuit court for imposition of a sentence other than death.

FOOTNOTES
1:     
The State's Exhibits numbered 56 through 58 and 60 are photographs depicting Tyrone Miller's apartment and the view of the street from his apartment's second-floor window out of which he testified that he saw codefendant Permanian jogging at the time of the murder.